## WOLK v. UNITED STATES.*
### No. 10897.

Circuit Court of Appeals, Eighth Circuit.
Feb. 2, 1938.

*Writ of certiorari denied 58 S.Ct. 763, 82 L.Ed. ——.

William C. Green, of St. Paul, Minn. (Edgerton, Green & Edgerton, of St. Paul, Minn., on the brief), for appellant.

William J. Quinn, Asst. U. S. Atty., of St. Paul, Minn. (Victor E. Anderson, U. S. Atty., and Linus J. Hammond, Asst. U. S. Atty., both of St. Paul, Minn., on the brief), for the United States.

Before STONE, WOODROUGH and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge.

From a conviction on a charge of unlawful possession of goods stolen from an interstate shipment in violation of 18 U.S.C.A. § 409, this appeal is brought.

Appellant presents here three issues, as follows: (I) Failure of evidence to show that the goods were stolen in interstate commerce; (II) improper admission of evidence; (III) insufficiency of evidence to justify submission of the case to the jury.

## I. Interstate Commerce.

The contention that the goods here involved were stolen while not in interstate commerce is based upon the situation following. The Bruce Transfer Company operated trucks in interstate commerce with a terminal at St. Paul, Minn. The McCue Transfer Company was a truck company located at St. Paul and operating only within a radius of 35 miles therefrom. It was not an independent interstate carrier. There was an arrangement between these two companies by which the latter made pickups and deliveries of freight for the former within the Twin Cities. Such pickups were delivered at the terminal of the Bruce Transfer Company, where they were reloaded on trucks of that company for further shipment to destination. The porter at the Radisson Hotel in Minneapolis had bills of lading of various railroads and truck companies which he was authorized to issue covering shipments over such lines. The shipment in question, consisting of several trunks containing furs, was delivered to the porter by a guest of the hotel for shipment to Kansas City, Mo. The porter made out proper bills of lading of the Bruce Transfer Company and delivered the shipment to a truck of the McCue Transfer Company upon such bills of lading. While this truck was en route with the shipment from the hotel in Minneapolis to the terminal of the Bruce Transfer Company in St. Paul, the trunks and their contents were stolen.

Under the above undisputed fact situation, the contention of appellant is that the shipment had not yet entered upon its interstate carriage and would not do so until delivery to the Bruce Transfer Company, but was, at the time of the robbery, in a purely intrastate movement. This position is unsound. Appellant relies particularly upon Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; The Daniel Ball, 10 Wall. 557, 19 L.Ed. 999, and Marifian v. United States, 8 Cir., 82 F.2d 628, certiorari denied 298 U.S. 686, 56 S.Ct. 956, 80 L.Ed. 1406, besides citing other cases.

Until a few years ago, factual situations were such that this contention of appellant would, usually, have been entirely sound. Formerly interstate carriers had nothing to do with picking up shipments from the shipper. The method of doing business was to have termini to which the shipper was compelled to deliver his shipments, the carrier having no concern with them until they were so delivered at the termini. With the

advent of interstate shipment by trucks a different situation came into being. The trucks would pick up the shipments from the shipper. This gave rise to competitive conditions which have forced even the railways to adopt this same practice in many instances. The result is that where this is done the delivery for interstate shipment is made by the shipper at his residence or place of business and the responsibility of the interstate carrier begins at that point. Such has long been the practice of express companies, even antedating the advent of trucks.

Here the shipper had nothing to do with the delivery of these trunks at the St. Paul terminus of the Bruce Transfer Company. The hotel porter was the agent of the Bruce Company in issuing the bill of lading and in delivering them at the hotel to the Bruce Company itself or any one it might designate. The McCue Company, under its arrangement with the Bruce Company, was so designated and it was merely the agent of the Bruce Company in this transaction. The responsibility of the Bruce Company for these trunks as an interstate shipment began, at least, upon the delivery of them at the hotel to the McCue Company. Such is the actual and the legal situation. Because of this situation, this contention must be ruled against appellant.

## II. Admission of Evidence.

The evidence involved in this point has to do with three items of similar character, all occurring in the cross-examination of appellant.

On direct examination, counsel for appellant developed that appellant had pleaded guilty to a charge of conspiracy for transportation of intoxicating liquor. With the evident intention of minimizing that offense, appellant testified that his company and several other transfer companies were doing work for some chemical company that had alcohol permits; that the chemical company unlawfully diverted the alcohol and his company, with several other transfer companies, were included in the conspiracy under the charge of making local deliveries of the alcohol.

On cross-examination, the government sought to meet this matter by showing the character of the conspiracy. After eliciting from appellant that the indictment charged him with "some hundred other men" with trucking of alcohol involved in the conspiracy, he was asked if he was not charged in the indictment with Morris Miller, A. Gleckman, Ben Gleckman, Tom Brown, Morris Roisner, and Leon Gleckman in the conspiracy. To this question the only objection made was as follows: "I object to that question unless counsel reads the names of the other defendants. It is not fair to pick out the names of a bunch of gangsters, without reading the others." Counsel for the government responded, "I will be glad to read all of the names." The court stated that he saw no necessity in having all of these names read, to which counsel for appellant responded, "I think I can take care of that on redirect examination, anyhow." The answer of appellant was, "I don't remember that." Testing his memory, the question was then asked "Do you remember Leon Gleckman being in that conspiracy?"

Objection to this question was:

"Mr. Green: That is objected to as improper cross-examination, and an attempt to inject wholly collateral matters into the case. The only question which counsel is entitled to ask, as a matter of attacking this witness' credibility, is as to whether or not, unless he has admitted his conviction, the same should be barred, and,—

"Mr. Hammond: I think that is true in the ordinary case, but it is set forth before this jury the fact this man was convicted for hauling certain alcohol in which there were cosmetics or some other things, which indicated it was not a very serious crime. They have set that out, and I think I should be allowed to explain it."

The objection was overruled but the question was not answered. The following question was, "Wasn't Morris Roisner involved in that conspiracy?" to which the same objection was made and overruled. The answer was, "I don't remember." The next question was, "Was Leon Gleckman involved in it?". To this question there was no objection, the answer being, "I don't remember that." The next question was, "Was Abe Ginsberg involved in it?" There was no objection to this question and appellant answered that there were several kinds of companies and one hundred names in the indictment, that he did not remember who they were and that he knew some of them and did not know some of them. He was then asked, "Was your brother, Joseph Wolk, also indicted with you in that conspiracy?" to which he answered, "He was dropped out." After this answer had been made, it was objected to "as incompetent, irrele-

vant, immaterial, and purely an attempt to prejudice the jury against the defendant. Counsel has gone beyond the limits of impeaching questions." On redirect examination, appellant was asked whether he knew that certain other named persons and companies were included in the conspiracy. On recross-examination it was suggested to appellant that he had remembered most of the names, involved in the conspiracy, mentioned by his counsel but that he could not remember those suggested by counsel for the government. He was then asked, "But you didn't remember Leon Gleckman?" to which there was no objection, and he answered: "Some of them I didn't remember, and some of them I don't know personally. I do remember Morris Roisner being in it and Thomas Banks, I know him personally."

The attack now made upon this evidence is in so far as it related to Leon Gleckman, Morris Roisner, and Joseph Wolk, and is that it was improper cross-examination for the sole purpose of creating prejudice. It would seem, from the above portions of the record, that no such objection was made concerning Gleckman and Roisner in connection with the original question concerning them, and, the statement having been made by counsel for appellant that he would take care of the matter on redirect examination and the answer of appellant being that "I don't remember that," would justify the further particular examination as to Gleckman and Roisner. As to Joseph Wolk, there was no objection until the question had been answered in a manner not unfavorable to appellant.

Even had proper objection been made and a proper record preserved, it is by no means clear that such cross-examination was not justified by the preceding direct examination on this point. At any rate, there is no merit in this contention.

### III. Sufficiency of Evidence.

As much of the evidence will be discussed hereinafter, only such outline statement of the situation as is necessary to make that discussion understandable will be here made. Some time after the furs had been stolen from the McCue Transfer Company truck, a radio box packed with the furs was carried by a truck of the Wolk Transfer Company (operated and largely owned by appellant) to the Hennepin Transportation Company (another trucking company) for transportation to Chicago. The transportation by the Wolk truck was only three blocks. The box in which the furs were packed had been used shortly before in delivering to appellant a radio purchased by him from a radio retailer in Minneapolis. The furs were packed in ordinary wrapping paper, of which there was a supply available to customers of the Wolk Company and for sale by it at its warehouse where this shipment originated. On arrival of the box at Chicago, the consignee reshipped it to Minneapolis (by the Hennepin Transportation Company) to a fictitious consignee. The Chicago police became suspicious and had instructions sent to the Hennepin Company to hold the shipment when it arrived at Minneapolis. They also notified the Minneapolis police. When the Hennepin Company received notice to hold the shipment on arrival at Minneapolis, one of its employees telephoned the information to appellant. The same day, appellant was interviewed by Minneapolis police officers. Subsequent extended investigation by such officers resulted in turning the matter over to federal investigators which was followed by this indictment.

Appellant's explanation was that a man, whom he knew as "Miller," and another man unknown to him brought the box to the warehouse on a Saturday afternoon after work hours when every one had gone except appellant; that Miller told appellant the box contained clothing; that Miller arranged for the shipment to Chicago, paying appellant his trucking charge of $1 for carrying the box three blocks to the Hennepin Transportation Company's freight office; that he knew nothing of the shipment otherwise; that one of his belated truckmen trucked the box over to the Hennepin Company.

The contention of appellant as to the insufficiency of the evidence to justify submission to the jury is aimed at the specific matter that the evidence was insufficient as to guilty knowledge of appellant that the goods in his possession were stolen goods. We have read and studied all of the evidence and have come to the conclusion that there was sufficient evidence to justify submission to the jury.

Naturally, this evidence is circumstantial. The proven facts constituting circumstances justifying our conclusion are as follows:

(a) Appellant had a previous criminal record. This record involved unlawful transportation of liquor. His plea of guilty thereto admitted that he had knowingly en-

gaged in a conspiracy to violate the law by transporting liquor in the course of his trucking business. Therefore, we start with a man who has no conscientious scruples against violating the law.

(b) The next item is that the box in which the furs were packed while in his possession had belonged to him. He presents a plausible explanation as to how this box might have gotten out of his possession into that of the thieves, then, after the furs had been placed therein, returned to his possession without his knowing the contents. The fact that this identical box was used to pack the furs would be a very extraordinary coincidence, even if his explanation were accepted. However, an examination of the next matter as to the movement of this box materially weakens his explanation.

(c) The circumstances surrounding the movement of this box from his house to the warehouse and thence into the hands of the thieves are significant. There is no dispute that this box came to his house enclosing a radio which he had bought. It had been brought there from the radio sales house on one of his trucks. He testified that it was necessary to have a pick-up order for the truckmen to perform this service and that he had given such an order. Under any version of the testimony, the box remained at his house several days after the radio was unpacked. His testimony is that he had not noticed or paid any attention to the box when it was at his residence and that he did not know how it had gotten to the warehouse. He says that he did not give any pick-up order for any of his trucks to call for it and take it to the warehouse and he does not know who did. He suggests that such instructions might have been given by one of his family, but he produces no evidence of that, although it would seem such evidence could be readily produced by him if it existed. It is obvious that if the box was taken to the warehouse that it would have required a pick-up order from someone.

William Johnston and Milton Wolk were truckmen at the warehouse, Milton Wolk being appellant's nephew. Each of them testified, at the trial, that they had gone together to appellant's house, picked up the empty box, and brought it to the warehouse. Neither testifies where or from whom he got directions so to do.

When Johnston was questioned by officers before the trial as to his connection with this box, he did not tell them that Mil-

ton Wolk was with him. His explanation, at the trial, of this oversight was that he "wasn't quite clear on it then." However, at the trial, he was positive that Milton Wolk was with him.

When Milton Wolk talked with the officers prior to the trial, he gave them a signed statement in which he related that he and Johnston had delivered the radio in the box from the radio company to the residence of appellant and that he had not "seen the case since we left it in Isadore Wolk's kitchen." At the trial, he was positive that he joined with Johnston in bringing the box from appellant's house to the warehouse. His explanation of his contrary statement to the officers is, "I didn't remember about that time whether I did or didn't, so I just thought I would skip it until I really knew."

When officers asked appellant, prior to the trial, who Milton Wolk was, he denied knowing any such person, although Milton was his nephew and was working for him in the warehouse. His explanation of this extraordinary denial of knowledge is that he had always known him by the name of "Nunny" and never by the name of Milton.

It seems to us the circumstances that Johnston, Milton Wolk, and appellant all acted in a way to conceal from the officers all knowledge as to Milton Wolk having any connection with this box until the trial and that there is no evidence offered as to who authorized this box to be taken to the warehouse, are quite unusual. It suggests an attempt at concealment of the identity and movement of the box until the officers independently discovered the identity of the box and that Milton Wolk had some connection with it.

(d) The furs were packed in paper such as was kept in the warehouse for the use of customers and the radio box was strengthened by a strip of crating, such as was used in the warehouse. While it is entirely possible that this crating material, paper and also the nails used in closing the box could all have been secured elsewhere or could have been secured by some one who might have purchased the box and all of them at the warehouse without any guilty knowledge of appellant, yet it is a harmonious link in a chain.

(e) Another circumstance is the prompt trip of appellant to the police station as soon as he ascertained that there had been some question about the shipment and his statement there.

According to the theory of the evidence of appellant, his only connection with this box of furs was that of an innocent drayman who transported it three blocks to Hennepin Transportation Company, the trucking company which carried it to Chicago. He testifies that his only interest was in the $1 transfer fee for this service. He did not know the consignee and he knew the consignor so slightly that he did not even know his name until furnished him at the time of the shipment, did not know his address, nor anything else about him except that he had seen him several times upon the street. Five days after he delivered the shipment he was called up by the trucking company to which he had delivered it and which had carried it to Chicago. He was then told that the shipment had been resent back to Minneapolis and that it was under investigation by the police of Chicago. Although he stated to this informant that he had no interest in the shipment except his $1 charge, which he had received, and that it should be delivered to the police, if they wanted it, yet he says he "immediately" went down to police headquarters and made inquiry there from an acquaintance of his, who was inspector at headquarters.

As to what this inquiry was, there is a difference between appellant's testimony and that of Inspector Ohman. Ohman testified that appellant said he had shipped a box of clothing to Chicago and "they were trying to hijack it down there and he wanted to know if there was any request from the Police Department of Chicago in regard to Izzy Wolk." Appellant testifies that he told Ohman that there was some trouble in Chicago about a box of clothing or freight he had shipped there for a fellow and he asked the inspector, "Have you any information to that effect?" This was before the police at Minneapolis had any information concerning the matter.

It is rather difficult to understand this lively interest and activity in this shipment on the basis of an innocent shipment. The testimony is undisputed that appellant was a very busy man, and when he took the time and had the desire, immediately after he received information that the Chicago police were concerned about this shipment, to go to police headquarters to find out what the Minneapolis police knew about it, it is evident there was something disturbing to him in the situation. He could not have been concerned as to the consignee for he did not know him. He could not have been concerned as to the consignor, for he knew him very slightly and did not know even where to find him or to communicate with him. His concern could not have been otherwise than personal.

Another significant circumstance in this connection is the statement of Officer Ohman to the effect that appellant stated they were trying to hijack the shipment at Chicago and he wanted to know if there was any request from the police department of Chicago in regard to Izzy Wolk. Why there should be an inquiry as to him by the police department of Chicago in connection with hijacking this shipment at Chicago is difficult to comprehend.

(f) Another circumstance is the statement he made to the officers when they came to interview him the afternoon of the same day. His visit to the police headquarters had been before noon. Thereafter, a wire was received by the Minneapolis police department from the Chicago police department to the effect that the action at Chicago concerning the shipment had aroused the suspicion of the Chicago police that it might be goods stolen in Minneapolis. About 3 o'clock that afternoon, two detectives went to the Hennepin Transportation Company office to investigate this shipment and ascertained that it would not arrive for several hours. Finding out that it had been delivered to that company by appellant's company, they then interviewed him. They asked concerning the consignor and, as appellant gave them no information by which they could locate the consignor, one of them stated they would go back to the trucking company and watch for the person calling for the shipment. To this suggestion appellant volunteered that it would do no good to watch the shipment because the people who shipped the box would know it was being watched. Appellant says that his statement was that it would be almost no use to watch the shipment because "everybody knew about it." He says the basis of such statement was because "The Hennepin Transfer Company knew about it and they said that the Chicago authorities knew about it," and also that because the information had gotten up to him before it had reached the Minneapolis police. The only possible effect of such a statement, if it should have any effect, would be to prevent the officers watching the shipment. His explanation of the reasons he thought those concerned in the shipment would know it was watched are not even plausible. The

fact that the Chicago and Minneapolis police were interested in the shipment and that the Hennepin Company had been notified of that interest does not at all imply that the thieves would have any such information or would not call for the shipment. In fact, the contrary would seem to be true.

(g) Another circumstance is his description of the shipper who, he says, gave him the name "Sam Miller." Three Minneapolis police officers interviewed appellant upon numerous occasions prior to the trial. Obviously, this description was of the utmost importance to the police. Appellant was frequently pressed upon that point. One of them seems to have little recollection as to the description given of the shipper. Each of the two officers who remember his description testify positively that at no time before the trial did he, in any description of Miller, tell them that he had a mustache. At the trial, he testified that Miller had a small mustache. It is difficult to understand this action of appellant except upon the theory that he did not really wish to aid the police in discovering Miller.

(h) Another circumstance is his testimony concerning his search for Miller. He had told the officers that he knew Miller only by seeing him sometimes upon the street in Minneapolis. The officers asked him to look out for Miller. He testifies that, while in a night club at Minneapolis, he happened to be talking to a stranger at an adjoining table, and ascertained that he was a tobacco salesman out of Chicago. He asked the salesman if he knew a Sam Miller in Chicago. The salesman said that he did not know any man by that name in Chicago but there was one in Milwaukee. He then states that, on a social visit to Milwaukee, he unsuccessfully looked around for Sam Miller. The above statements were made in explanation of testimony by the government agent who investigated the case to the effect that he had asked appellant if he had found out anything more about Sam Miller and appellant said, "No, the only thing he had heard was that he was down in Chicago, and he made a trip to Chicago to locate him." This explanation is just a bit fantastic.

(i) Other circumstances are that this shipment was handled in the warehouse on Saturday afternoon when few people would be about and that appellant was the only one who had anything to do with the shipment.

(j) Another interesting circumstance is the unwillingness of appellant to identify his handwriting on the bill of lading covering this shipment.

On the basis of all of the above considerations, it seems to us there was sufficient evidence to go to the jury upon guilty knowledge.

### Conclusion.

The judgment should be and is affirmed.