**UNITED STATES v. SHERMAN et al.**

No. 28, Docket 21001.

United States Court of Appeals
Second Circuit.

Dec. 29, 1948.

Zeitz, Harris & Moscowitz, Harold Cowin, Joseph Aronstein, and Eugene F. Bannigan, all of New York City, for Maimone.

Saul L. Harris, of New York City, for Sherman.

Vine H. Smith, of Brooklyn, N. Y., for Whelen.

Joseph Aronstein, of New York City, for Gramaldi, argued for appellants.

J. Vincent Keogh, U.S. Atty., and Edward S. Szukelewicz, both of Brooklyn, N.Y., for appellee.

Before L. HAND, Chief Judge, and CHASE and FRANK, Circuit Judges.

L. HAND, Chief Judge.

Sherman and Whelan appeal from convictions under counts one and three of the indictment here at bar; Gramaldi and Maimone appeal from convictions under counts two and three. The first count was

for stealing goods while they were moving in foreign commerce; and second count was for receiving, and having possession of, the same goods, knowing them to be stolen; the third count was for a conspiracy to steal and conceal the goods. Sherman's appeal is based upon the insufficiency of the evidence to support a verdict in a criminal prosecution, and upon several other points, only one of which it will be necessary to consider: i. e. the admission in evidence of the contents of a written statement of the chief witness for the prosecution. Whelan's appeal is based (1) upon the failure of the prosecution to prove that the goods were moving in foreign commerce; (2) upon the misjoinder of charges and of defendants; and (3) upon the erroneous admission of declarations of some of the co-defendants. Gramaldi's appeal is based (1) upon the insufficiency of the evidence; (2) upon a remark of the district attorney; and (3) upon a portion of the judge's charge to the jury. Maimone's appeal is based (1) upon the insufficiency of the evidence; and (2) upon the fact that the crime, if any, was not committed in the Eastern District of New York. The following is a statement of the facts as the jury might have found them, if they accepted the testimony of the prosecution's chief witness, Oliva, an informer who had been a confederate of the accused.

Sherman and Whelan, in company with several others, not including Gramaldi and Maimone, met in a saloon in Brooklyn, known as "Ponzo's Bar," on March 4, 1946, to agree upon a place where they could temporarily deposit some bales of duck canvas, which they had already planned to steal from a truck that was to carry them to the "docks" on the following day. On the fifth they seized and drove away the truck with the bales on board, while the driver had gone to a steamship office to secure from the carrier the papers which would evidence his delivery of the bales. Sherman and Whelan rode the truck to the agreed place, called "Paul's," unloaded the bales, and abandoned the truck. On the eighth Gramaldi and Oliva went to "Paul's," put the bales on another truck, and drove to a place called "Kaplan's" in Manhattan, where they, assisted by Maimone and another of the accused, called Mastromarino, unloaded and deposited them, and from where they were later disposed of. Oliva did not testify that Gramaldi and Maimone were present when the bales were stolen; or that Sherman and Whelan were present when they were delivered at "Kaplan's." However, if the jury believed his testimony, Sherman and Whelan were guilty of the theft and were indeed among the prime movers in the undertaking.

Sherman argues that this evidence, even though it might serve in a civil action, was not cogent enough to sustain a conviction; but this rests upon a misconception of the law. The question, whether a judge shall submit the evidence to a jury for a verdict, is no different in a criminal prosecution from the same question in a civil action; in each it is whether the evidence will rationally support a finding in favor of the party having the affirmative. The only added protection given the accused in a prosecution is that the jury must be satisfied of his guilt beyond a reasonable doubt. This we have held many times;[1] and we should affirm Sherman's conviction, were it not for the admission of the statement that we have mentioned, which got into the case in the following way. After his arrest Oliva made a written statement to an officer of the Federal Bureau of Investigation, in which he did not mention Sherman as being connected with the transaction at all; and said that it was Whelan who had been the driver of the truck. At the trial, however, he testified, not only that Sherman was a party to the theft, but that it was he who drove the truck. Sherman put in the written statement to impeach this testimony; and to break the force of the impeachment the judge allowed the prosecution to get before the jury part of the contents of a second written statement, made by Oliva to

[1] United States v. Valenti, 134 F.2d 362, 364; United States v. Feinberg, 140 F.2d 592, 154 A.L.R. 272; United States v. Andolschek, 142 F.2d 503; United States v. Cohen, 145 F.2d 82, 86; United States v. Picarelli, 148 F.2d 997; United States v. Greenstein, 153 F.2d 550.

an officer a few weeks after the first, in which he told the story as he had testified on the stand.

■■ Concededly the second statement was not competent unless the admission of the impeaching statement made it so, for when Oliva made it he had the same motive to fabricate—the hope of lenity—that he had while on the stand.[2] Rationally, it is true, the fact that he changed his story so soon after making the contradictory statement, may have added to the persuasiveness of his testimony; and for that matter most persons would probably consider any earlier consistent account, in some measure at least, confirmatory of a witness's testimony. The reason for its exclusion is because it has not been made on oath rather than because it has no probative value, although courts have often spoken as though it had none. However, such a statement is as incompetent when the witness has been impeached by an inconsistent statement, as when he has not been. So the Supreme Court decided many years ago;[3] and although the point has apparently never come up again in that court, the lower federal courts have several times applied or recognized the doctrine.[4]

It is true that, when the witness's testimony was not impeached, but only "aspersed" by the defendant's counsel, we held that the admission of such a corroboratory statement was harmless error,[5] but we should scarcely have warrant for doing so here. Sherman's connection with the stealing of the truck was of course crucial under the first count, and nearly so under the third. Oliva's failure to include him in his first version might well have thrown doubt upon his later testimony; and, as we have just said, his early correction of that version was, rationally, not an inconsiderable circumstance. The prosecutor certainly thought so, for he used it in summing up the case to the jury. We cannot be certain that it made no difference in the verdict, and Sherman's conviction must be reversed and the cause remanded as to him. Obviously, so far as the second statement had any effect whatever upon Whelan, it strengthened his defense.

■■ Whelan's chief insistence is that the goods had not begun to move in foreign commerce. The evidence about this was that the sellers had labelled the bales with the names of the consignees and their addresses: "Mombassa, Kenya, British East Africa"; and had put them on the truck of a man, named Cohen, who had contracted to carry them to the dock where they were to be delivered to the steamship company. As we have said, the truck had come near enough to the dock for the driver to go after his receipt; but Whelan argues that, as the bales had not yet come into the possession of the carrier, they had not entered foreign commerce. His chief reliance is Coe v. Errol[6] and United States v. Yellow Cab Co.[7] In United States v. Fox[8] we discussed Coe v. Errol, supra, and have nothing to add to what we then said. The situation then before us was the same as that at bar except that the truck driver had there already received the bill of lading from the railway clerk. It may be argued that this changed the possession from the truck owner to the railroad, though that is doubtful, but in any event we think it irrelevant. It is true that the Eighth Circuit in Wolk v. United States[9] implied that interstate commerce did not begin before delivery to a common carrier; but we did not agree with them in United States v. Fox, supra;[8] and we do not now. We then made it the test that the goods should leave the possession of the shipper, and come into the custody of someone who without more than inevitable pauses was to pass them along. The Third Circuit went even fur-

[2] Di Carlo v. United States, 2 Cir., 6 F.2d 364.

[3] Ellicott v. Pearl, 10 Pet. 412, 9 L.Ed. 475; Conrad v. Griffey, 11 How. 480, 13 L.Ed. 779.

[4] Yoder v. United States, 10 Cir., 71 F. 2d 85; Brady v. United States, 8 Cir., 39 F.2d 312; Third National Bank & Trust Co. v. United States, 6 Cir., 53 F.2d 599, 602; Dowdy v. United States, 4 Cir., 46 F.2d 417, 425.

[5] United States v. Potash, 118 F.2d 54, 57.

[6] 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715.

[7] 332 U.S. 218, 230-234, 67 S.Ct. 1560, 91 L.Ed. 2010.

[8] 2 Cir., 126 F.2d 237, 238.

[9] 94 F.2d 310.

ther in United States v. Gollin[10] for the truck which was stolen was the seller's, and had merely moved from the loading platform to where a driver was to mount it to take it out of the state. United States v. Yellow Cab Co., supra[7] may be thought to look the other way; and it does caution us against too ready an assumption that all parts of an uninterrupted journey which begins in one state and ends in another are interstate commerce. It may be difficult by any general proposition to distinguish between the continuous journey of persons and of goods; but the court certainly intimated that there might be a distinction in specific instances when it said 332 U.S. on page 231, 67 S.Ct. on page 1567, 91 L.Ed. 2010: "Moreover, what may fairly be said to be the limits of an interstate shipment of goods and chattels may not necessarily be the commonly accepted limits of an individual's interstate journey." We do not believe that this decision has recognized the doctrine implicit in Wolk v. United States, supra,[11] and we adhere to our ruling in United States v. Fox, supra.[12]

■ Whelan's objection is without substance that the declarations of the other confederates after the theft should not have been admitted against him or Sherman. These were admissible because the jury might conclude that the theft included a successful disposal of the bales, and did not end with the deposit of the bales at "Paul's" on the fifth. For instance, when Westo told Oliva that Sherman and Whelan "were starting to take a load," it was information exchanged between confederates about the progress of the concerted enterprise, and a step in its performance. The judge apparently was much more guarded as to this part of his rulings than he need have been. It is not necessary to discuss the objection to joinder of the three counts; and the conviction of Whelan upon counts one and three will be affirmed.

■ Gramaldi and Maimone argue that there was no evidence to support the conclusion that they knew the bales were stolen when on the eighth they were taken to Manhattan from "Paul's" and delivered at "Kaplan's." Oliva swore that on the morning of the eighth he met Maimone at "Ponzo's Bar," and that Maimone told him that he had arranged for the receipt of the bales at a place on Eldredge Street in Manhattan—"Kaplan's." Oliva then went to "Paul's" where were Sherman, Whelan and several of the other accused. They discussed the removal of the bales to "Kaplan's" and one of them went out and fetched Gramaldi; who loaded the bales on a truck, drove it with Oliva to "Kaplan's," and there delivered the bales. As to Maimone, the evidence was plainly sufficient, conclusive indeed, if believed; for he arranged for the transfer to Manhattan. More may be said as to Gramaldi, who argues that he was only a driver called in for the occasion; but the surrounding circumstances were enough to satisfy a jury that he was aware that the transfer was sinister. The bales were labelled for export; they had been deposited in a most unlikely place and they were carried to, and left at, another such deposit. Why should honest men be shifting such goods about in so unwonted and furtive a fashion? And, even though this had not been enough, the jury could infer, from possession of stolen goods, knowledge that they were stolen. Gramaldi did not admit possession and seek to prove lack of such knowledge; instead, he relied on an alibi and also on character evidence, both of which the jury could, and presumably did, disbelieve.

■ On the other hand, it is possible that Gramaldi and Maimone did not know that the bales had been stolen while moving in foreign commerce; for they were not in the same position as Sherman and Whelan who stole the truck; and, although the bales bore a foreign address, they might not have yet started on their way. So far as concerns the second count —receiving—it was enough, if they knew that the bales had been stolen, for it was not necessary that they should also know them to have been stolen from foreign commerce.[13] On the other hand, we held

---

[10] 166 F.2d 123.

[7] 332 U.S. 218, 230–234, 67 S.Ct. 1560, 91 L.Ed. 2010.

[11] 8 Cir., 94 F.2d 310.

[12] 126 F.2d 237.

[13] Kasle v. United States, 6 Cir., 233 F. 878; Rosen v. United States, 2 Cir., 271 F. 651, 654, 655; Loftus v. United States, 7 Cir., 46 F.2d 841, 847.

in United States v. Crimmins[14] and United States v. Bollenbach[15] that such a scienter is necessary in a prosecution for a conspiracy; and their conviction must be reversed on the third count.

■■■■■■ Gramaldi's next objection is to the following passage in the judge's charge on the question of scienter under counts two and three: "We have a rule of law, which you could apply in this case, that one who possesses goods recently stolen is presumed to know that they have been stolen—not where they were stolen, he is not presumed to know that they are stolen from foreign commerce—but he is presumed to know that they were stolen." While we have held a number of times that the jury may find in the accused's unexplained possession of stolen goods enough evidence to convict,[16] we have never intended to indicate that the jury should be directed that it was required by a rule of law to make this inference. In discussions among lawyers and judges of the difference between a permissible inference and a presumption, the terminology may be unimportant. But the jury may be misled by the word "presumption"; and here it may have interpreted that word as far stronger than a permissible inference. This might require reversal if Gramaldi had taken an exception to this portion of the charge. Although there was some discussion of this question before the charge was delivered, Gramaldi took no exception to this paragraph and he made no specific request on this point. Having failed to comply with Federal Rules of Criminal Procedure, rule 30, 18 U.S.C.A., he cannot here assign this part of the charge as error. We take this occasion to say that it would be well if no trial judges ever referred in a charge to such a presumption, for "the word presumption * * * carries unpredictable connotations to different minds."[17]

■■■■■■ Gramaldi's last ground for reversal is an improper comment of the prosecuting attorney, which came about in the following way. A witness for the prosecution, named Cohen, who had been the janitor at "Kaplan's," testified that he had been present when the bales were delivered on the eighth; but he could identify only Mastromarino, out of all the accused, as having been among those who took part in the delivery. The objection was that, when Cohen was leaving the stand, the district attorney said: "I am wondering if he needs an FBI man to take him home." None of the attorneys of the accused except Mastromarino's chose to cross-examine Cohen, from which it would appear that the others thought that his testimony had not injured them; and on the surface at least, it would seem that, so far as this occurrence affected anyone, it was only Mastromarino. Sherman and Whelan could not possibly have been affected, and it is only by a circuitous reasoning that it can be supposed to have concerned Maimone and Gramaldi. This reasoning would be that, although Cohen identified only Mastromarino, Oliva had testified that Gramaldi and Maimone were also at "Kaplan's" when the bales were delivered, and that they might be supposed to resent Cohen's testimony which by corroborating Oliva as to Mastromarino corroborated that part of his story which took them also to "Kaplan's." The district attorney's comment would on such an assumption be thought to suggest to the jury, not only that Mastromarino might vent his resentment against Cohen by violence for directly connecting him with the crime, but that Gramaldi and Maimone might do the same because of this indirect connection. This seems to us in any event to reduce to a phantom any possible prejudice to them; but, even if we are wrong as to this, the comment should not result in reversing their convictions. If the jury believed Oliva at all, these two men were engaged in a venture of a kind which made it not impossible that they might molest witnesses who appeared against them. The comment could prejudice them only in case it lent credence to Oliva's story, and it seems to

---

[14] 123 F.2d 271.

[15] 147 F.2d 199.

[16] Degnan v. United States, 271 F. 291; Rosen v. United States, 271 F. 651, 655; Drew v. United States, 27 F.2d 715;

United States v. Di Carlo, 64 F.2d 15; United States v. Bollenbach, 147 F.2d 199; United States v. Werner, 160 F.2d 438, 441.

[17] A. L. I. Model Code of Evidence, Rule 704, Comment b on Paragraph (2).

us fantastic to suppose that the district attorney's suggestion that they might be prone to violence could have any such tendency. No prosecution is tried with flawless perfection; if every slip is to result in reversal we shall never succeed in enforcing the criminal law at all.

Maimone's last point is that because the only evidence connecting him with receiving the goods showed him to be in Manhattan, he should have been indicted in the Southern District of New York. But he had arranged for the delivery at "Ponzo's Bar," and his appearance at "Kaplan's" was therefore the continuance of a joint possession which began in Brooklyn.

The conviction of Sherman on counts one and three is reversed and the cause remanded for a new trial.

The conviction of Whelan on counts one and three is affirmed.

The conviction of Gramaldi and Maimone on count two is affirmed; and their conviction on count three is reversed.