UNITED STATES of America, Appellee,

v.

Frederick J. FAYETTE, Appellant.

No. 97, Docket 31257.

United States Court of Appeals Second Circuit.

Argued Nov. 6, 1967.

Decided Jan. 12, 1968.

---

Richard E. Reilly, Atty., Dept. of Justice, Washington, D. C. (Joseph F. Radigan, U. S. Atty., for the Dist. of Vermont, Rutland, Vt., on the brief), for appellee.

Frederick W. Allen, Burlington, Vt. (Joseph A. McNamara, McNamara, Fitzpatrick & Sylvester, Wick, Dinse & Allen, Burlington, Vt., on the brief), for appellant.

Before LUMBARD, Chief Judge, and MEDINA and HAYS, Circuit Judges.

MEDINA, Circuit Judge:

Having been convicted after a trial to Chief Judge Gibson and a jury of knowingly receiving $3000 from Frederick A. Flint as a political contribution and for personal emolument in consideration of his promise of support and the use of his influence in obtaining for Ned W. Handy the position of Postmaster of St. Johnsbury, Vermont, in violation of 18 U.S.C., Section 211, Frederick J. Fayette appeals.

At the center of the case is an oral statement made by appellant Fayette to FBI Agent John W. Fowkes in appellant's law office in Burlington, Vermont, on December 31, 1963. Reversal of the judgment of conviction is sought on the ground that there was not sufficient corroboration of this statement by independent proof to justify submission of the case to the jury. Other contentions relate to alleged errors in the instructions to the jury and in receiving in evidence over objection a certain sworn statement by Handy made on December 20, 1963.

To keep the case in focus and for the purpose of clarity we have thought it best to make a preliminary survey of the principal incidents and the participants and reserve a more detailed discussion of the testimonial and documentary proofs for the part of this opinion devoted to the issue of corroboration. We find the corroboration amply sufficient to meet the legal requirements. We also find no error in the instructions or in the ruling on the admissibility of Handy's statement. We affirm the judgment.

I.

In the early part of 1961 it was common knowledge in St. Johnsbury that there would soon be a vacancy in the office of Postmaster as Frank Barney, the incumbent, was up for mandatory retirement on February 28, 1962. Appellant Fayette was then the State Chairman of the Vermont Democratic Party and he was elected a Vermont State Senator later that year. Ned Handy and appellant Fayette were friends but the relationship was not so close as that between Handy and Frederick A Flint, an elderly Republican who had in prior years been Sheriff of Caledonia County. Irrespective of who started the idea on its way, there came a time when Handy decided to do what he could to become Postmaster of St. Johnsbury and the subject was frequently discussed not only as between Handy and Fayette but also by them in the presence of others.

As postmasters fall in the category of political patronage and as it is important in the public interest that only competent persons of good reputation be chosen, there is a certain procedure that has been followed for some time. At the bottom of the political hierarchy relevant to the case before us is the St. Johnsbury Democratic Town Committee. In the Spring of 1961 Mrs. Laferriere was Chairman of this Town Committee. Higher up was the Democratic State Chairman of Vermont, appellant Fayette. He was succeeded in the Fall of 1961 by John M. Spencer. Since the days of President Lincoln, we are told, members of the Congress who are of the same political party as the President have been given the prerogative of making recommendations to the Post Office Department on the selection of postmasters. In view of the fact that at the time of the incidents recorded at this trial there were no Democratic Senators or Congressmen from Vermont, appellant Fayette up to the Fall of 1961 and Spencer thereafter were the "advisors" to the Post Office Department on these matters.

In the event of a vacancy the usual but not invariable custom and practice was that the Civil Service Commission solicited applicants and then by competitive examination all but 3 of the applicants were weeded out and the names of these three and the order of precedence among them on the merits were set forth in a Register of Eligibles published by the Civil Service Commission. This procedure was followed in the filling of the vacancy in the St. Johnsbury postmastership. In due course the publication of the Register of Eligibles would be followed by a recommendation by the State Chairman, who might or might not, but probably would follow the endorsement of the Town Committee. He was required, however, to select one of the highest 3 names on the Register of Eligibles. After receipt by the Department of the recommendation of the State Chairman there was usually a prompt processing by the Post Office Department, followed by appointment by the President and the issuance of the commission to the new postmaster after approval by the Senate.

But there might be delays and objections. Without going into too much detail, the persons whose duties brought them in contact with these delays and objections were John M. Bailey, the Chairman of the Democratic National Committee, and his assistant Pendergast, Michael Monroney, Executive Assistant to the Postmaster General, and Raftery who was one of the Secretaries in the office of the Division of Postmaster Appointments and Rural Carriers, which was in turn part of the Bureau of Operations. Monroney's Deputy was Tyler Abel. Thus, in the case of political interference with the normal procedures one would expect communications over the telephone or otherwise to Pendergast or Abel followed by directions issued by Bailey or Monroney. The only written record would generally be in the memorandum directions issued by Bailey or Monroney.

We turn now to what actually occurred, as clearly demonstrated by the documentary evidence, reserving for the moment the matters in dispute. On December 16, 1961 the Town Committee met and endorsed Handy for the office of Acting Postmaster of St. Johnsbury by a vote of 14 to 11. On February 28, 1962 Handy took office as Acting Postmaster and he served as such until October 23, 1963. The Civil Service Commission sent out applications and forms on October 9, 1962. Before the publication of the Certificate of Eligibles and on April 18, 1963 the Town Committee met and made the following endorsements for the office of Postmaster: # 1 Russo; # 2 Lanctot; # 3 Ouellette; # 4 Handy. On June 13, 1963 the Civil Service Commission published the Register of Eligibles with William L. McGraw as # 1, Handy as # 2 and Fife as # 3. On June 26, 1963 the Town Committee endorsed McGraw. On or just prior to July 15, 1963 Spencer wrote a letter to Monroney asking that McGraw's name "be submitted to the White House" and Monroney's memorandum to the Division of Postmaster Appointments of the Bureau of Operations on July 16, 1963 contains a direction that McGraw's name be included in the next list. On July 15, 1963 Flint's check to the order of Fayette for $3000 was deposited in Fayette's account in the Merchant's National Bank of St. Johnsbury and the proceeds credited to Fayette. Some time between July 16 and July 30, 1963 Pendergast asked Monroney if the nomination of McGraw had gone in. When Monroney replied that it had not he was requested to hold it up for a short time, and on July 30, 1963 Monroney sent a memorandum to Raftery telling him to take McGraw's name off the list. In August, 1963 Pendergast told Monroney to go ahead and submit McGraw's name and Monroney did so by direction contained in his memorandum of August 22, 1963. On August 29, 1963 McGraw was nominated, the nomination was confirmed by the Senate on September 30, 1963 and on October 2, 1963, the very day on which Fayette's check returning the $3000 to Flint was dated, the President

advised Pendergast of the Senate's confirmation and directed that the commission be issued.

We shall find that at each stage of this development appellant Fayette was in touch with Handy and with Handy's friend Flint.

Now that we have the sequence of events in focus, we turn to Fayette's statement to FBI Agent Fowkes and the corroboration. It may be stated parenthetically that Fayette testified in his own defense and denied he had made most of the statements that were the subject of Fowkes' testimony.

### A.

Fowkes testified that Fayette told him that after the Town Committee had on April 18, 1963 nominated four (sic) others ahead of Handy he was contacted by Flint, and Handy and his wife and they requested his services regarding any legal matters or investigative action that could be taken on Handy's behalf. He said he assumed that Flint would pay for any expenses he might incur.

Handy testified that after the action of the Town Committee and about the 1st of May, 1963 he and his wife and Flint had a conference with Fayette in the State Capitol building in Montpelier and Flint offered to compensate Fayette for his trouble but Fayette said he did not think this was necessary. During this conference, and in the presence of the Handys and Flint, appellant Fayette called up Abel in Washington and told him that he (Fayette) "had a particular interest in the Saint Johnsbury files and if he would flag it and let him know when the Register did come up." On the trial Fayette testified he did make the call but his version of what was said differed from Handy's.

### B.

Fowkes further testified:

"Mr. Fayette stated that in June of 1963 the Civil Service Commission Register was posted and Mr. William L. McGraw's name appeared as Number One on the list for the position. Shortly thereafter, Mr. Fayette said he contacted Mr. Fred Flint and told Mr. Flint he would need three thousand dollars to defray his expenses, that he might incur in attempting to get the postmastership for Mr. Handy" (Tr. p. 310) and "to pay for his time and expenses" (Tr. p. 311).

As Flint had died before the trial, we do not have any of his testimony on this crucial point. Handy said he knew nothing of any such arrangement and did not even suspect it until the occasion of the return of the $3000, which will be described later on in this opinion. But we do have Flint's check for $3000 deposited on July 15, 1963 and we do have Fayette's check dated October 2, 1963 returning the money.

### C.

Fowkes further testified:

"Mr. Fayette stated he made at least four trips to Washington, D. C. and made numerous phone calls on Mr. Handy's behalf and he stated that he hoped to postpone Mr. McGraw's appointment until September of 1963, at which time a new Town Democratic Committee would be selected in Saint Johnsbury and he hoped that this Committee would be friends of Mr. Handy and that they would nominate Mr. Handy and thereby override the previous nomination of Mr. McGraw made by the Town Committee in April, 1963."

The documents mentioned in our preliminary statement, all of which were produced from the files of the Post Office Department in Washington, show that requests to get McGraw's name off the list were made and that McGraw's name was actually taken off the list to be sent to the White House.

### D.

Fowkes further testified:

"Mr. Fayette stated that he returned Mr. Flint's three thousand dollars to him on October first 1963 by check dated October second, 1963 * * * that if he had been successful in securing the postmastership for Mr. Handy that he intended to keep the three thousand dollars, de-

duct any amount that he had incurred for his expenses and planned to donate the remainder to the State and/or National Democratic Parties."

Handy testified he saw Fayette's check for $3000 when Fayette handed it to Flint. Additional corroborative testimony was given by Handy to which reference will be made in some detail when we come later to discuss Handy's sworn statement of December 20, 1963. There was a letter in Fayette's handwriting and signed "Fred" that he delivered to Flint with the check for $3000. In this letter he stated "I wanted primarily to exhibit the enclosed to Ned so he would understand how far you had gone in his behalf" (Gov't. Exh. 12). Flint turned this letter and other documents over to the FBI on June 9, 1966. Flint died on August 29, 1966.

Appellant Fayette testified on the trial that Flint kept talking to him about money but he replied he could not be hired for compensation, and that about the latter part of August Flint told him he was going to contribute $2000 to the State Committee and $1000 to the National Committee and asked Fayette what he thought. Fayette testified he replied that the State party needed the money more than the National Party.

■■ Whatever may have been the earlier rule, requiring corroboration which tends to establish the whole of the *corpus delicti*, see Forte v. United States, 68 App.D.C. 111, 94 F.2d 236, 127 A.L.R. 1120 (1937), it is now well established that the only corroboration required is substantial independent evidence "which would tend to establish the trustworthiness of the statement." Opper v. United States, 348 U.S. 84, 93, 75 S.Ct. 158, 164, 99 L.Ed. 101 (1954). The evidence which we have already summarized in some detail far exceeds that required by this test.

## II.

■ Reversal is also sought on the basis of alleged error in receiving into evidence, after the cross-examination of Handy, a statement, signed and sworn to by Handy at the time he was first interviewed by Agent Fowkes on December 20, 1963. It has been held that a prior statement by a witness consistent with his testimony on direct examination will not be received unless there has been developed at the trial some motive to falsify or other qualifying circumstances that did not exist at the time the prior statement was made. Thus, in United States v. Sherman, 171 F.2d 619 (2d Cir. 1948), cert. denied Grimaldi v. United States, 337 U.S. 931, 69 S.Ct. 1484, 93 L.Ed. 1738 (1949) [1] relied upon by appellant, the witness had testified that a co-defendant Sherman participated in the commission of the crime and on cross-examination a statement made long prior to the trial was introduced to impeach the witness because the statement did not mention Sherman. The case was reversed because the trial judge received over objection a second statement made by the witness a few weeks after the first, which did mention Sherman as a participant. The reason was that the motive of the witness, the hope of leniency if he helped the Government was the same at the time he made all the statements. In other words, there was no proof of a motive to falsify that had not existed from the beginning. This is a far cry from the present case where the circumstances attending the examination of Handy made it imperative that his prior sworn statement be received in order to dispel any inference that the prosecution had on the very eve of the trial brought pressure to bear on Handy to give false testimony. In other

---

[1.] We think it clear that the traditional ruling in *Sherman* does not preclude the admission of Handy's statement in the case before us. Therefore we need not reach the question whether the time has come for this Court to reexamine the *Sherman* rule in the light of the trend in recent years toward a liberalization of the rules of evidence in order to throw as much light as possible on the facts in issue, and also in view of the broad discretionary powers of the trial judge in matters relating to cross-examination.

words, the principle here applicable is the fundamental principle of completeness,[2] lest a partial view of the complete picture bring about an unjust result. In this case Handy's statement of December 20, 1963 became of crucial importance because of certain repeated interrogations of Handy by defense counsel and by Government counsel shortly before the trial. The result was that Handy became so confused that he really believed Fayette had not said some of the things Handy later testified to and he only straightened himself out after the prosecutor had shown him the December 20, 1963 sworn statement and after he had gone to the scene of the conversation and refreshed his recollection. All this occurred not at the trial but just prior to the trial. As always the details are important. The chronological sequence is as follows:

On October 6, 1966 the prosecution turned over to defense counsel a copy of Handy's sworn statement of December 20, 1963 together with other documents. Handy's sworn statement contained the following:

> About the middle of September, 1963, I got a notification I would be replaced. A day or two later, Mr. Flint asked me to drive him to Montpelier and we tried to locate Mr. Fayette there and at Burlington. On our way back to Saint Johnsbury we met Fayette at Montpelier and he gave a check in the amount of three thousand dollars to Mr. Flint. Mr. Fayette told me I had a good friend in the person of Mr. Flint and that Flint had put three thousand dollars in escrow for the Democratic Party and if I didn't get the postmaster position, the party wouldn't get the money. Fayette said that Flint had put the money in escrow in July, 1963.

A week or so before the trial commenced on December 12, 1966 defense counsel interrogated Handy at the office of his lawyer. It does not appear that defense counsel made any reference to Handy's December 20, 1963 statement during this interrogation and we assume that it was not produced or in any way referred to. After they had finished talking to him Handy was of the belief that all Fayette had said was "I think you should know, Ned, what a good friend you had in Fred." There was further questioning the next day and Handy repeated the statement. There was more questioning, some by defense counsel and some in a long evening session with Government counsel. Handy stuck to his story. Government counsel showed him his sworn statement, he still stuck to his story and repeated this to defense counsel; and, finally, he went alone to the place where the incident occurred, communed with his conscience, and came to the conclusion that what he had orally stated to defense counsel and to Government counsel was wrong and that what he had stated in the December 20, 1963 sworn statement was right. All of this took place just prior to the commencement of the trial.

At the trial Handy testified on direct examination:

> Q. Now, what, if anything, was said by Mr. Fayette, either to you or Mr. Flint, or by either you or Mr. Flint to Mr. Fayette, at that time?
>
> A. Well, as Mr. Fayette handed the envelope to Mr. Flint, he says, "I'm sorry things didn't materialize," or in substance to that.
>
> \* \* \* \* \* \*
>
> A. He handed Mr. Flint a sealed envelope and Mr. Flint asked Mr. Fayette if he could open it in my presence and Mr. Fayette said "yes," "I'd like to have you to let Ned know what a good friend he has in you."
>
> Q. Go ahead, Mr. Handy.
>
> A. So, he opened up the envelope and he showed me a three thousand dollars check, and I asked him what they were showing this to me for and what is the meaning of it. Which was all completely new to me. Then, so, Mr. Fayette spoke up and he says the mon-

---

2. See United States v. Corrigan, 168 F.2d 641 (2d Cir. 1948); 7 Wigmore, Evidence § 2094 (3d ed. 1940).

ey was put in escrow by Mr. Flint that if I was to get the permanent position, the money would go to the Party and if not, the money would be refunded.

On cross-examination Handy confirmed what defense counsel already knew, to the effect that he had told defense counsel that all that was said at the time the $3000 was repaid to Flint was "I think you should know, Ned, what a good friend you had in Fred." He was methodically taken through the interrogations by defense counsel and the long evening session with Government counsel and a further interrogation by defense counsel. Handy testified on his continuing cross-examination that throughout this period of a week or so he told those who interrogated him that Fayette had said no more than "I think you should know, Ned, what a good friend you had in Fred." What defense counsel did not bring out but what he may well have surmised was that during the late evening session the prosecution had shown Handy his December 20, 1963 sworn statement, that this did not at first refresh his recollection and that the matter became clear in Handy's mind only after he had visited the scene of the conversation alone and tried to "activate" his mind and to dissipate the confusion that had resulted from the more or less continuous interrogations by the lawyers. This additional matter, including the December 20, 1963 statement is what was brought out on the redirect examination of Handy. Not only was the statement properly received into evidence, it was indeed absolutely indispensable as giving the complete story of the incident of the pre-trial interrogation of Handy, and the way his recollection was refreshed, taken as a whole. Without it and Handy's explanation the jury might well have inferred that the story Handy told on his direct examination was a recent fabrication perhaps induced by pressure exerted by Government counsel.

### III.

There was a hearing in the absence of the jury on the subject of the admissibility of Fayette's statement to FBI Agent Fowkes. Chief Judge Gibson made a finding that the statement was a voluntary one and, at the close of the Government's case informed counsel, in effect, that he would charge the jury that his finding was "not binding on them, that if they find it is not a voluntary statement within the law, they are to ignore it." Defense counsel made no objection to this at the time but did object after the trial judge had concluded his instructions to the jury, which included the statement that the trial judge had made a finding that the statement to FBI Agent Fowkes was voluntary. It is now contended that it was error to inform the jury of the judge's finding.

■■ We would be inclined to view this acquiescence in the ruling as a waiver as it is quite inconsistent with the subsequent objection made after the instructions and at a time when it was too late to expunge the statement from the minds of the jurors. However, we merely mention this in passing. A hearing in the absence of the jury was held, a finding of voluntariness was made by the trial judge and the submission of this same issue to the jury gave appellant a second chance not required by Jackson v. Denno, 378 U. S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).[3]

In the light of the evidentiary background this could not possibly have been prejudicial to appellant even if the trial judge did make reference to his finding.[4] The scene of the conference

---

3. See also Pinto v. Pierce, 389 U.S. 31, 88 S.Ct. 192, 19 L.Ed.2d 31 (Oct. 23, 1967).

4. The wording of Chief Judge Gibson's instruction in the present case was:
   The law is well grounded that an admission of the accused, if made voluntarily, without improper inducement and after

the Respondent has been advised of his rights, are admissible against the Defendant.

The Supreme Court of the United States has held that after an accused has been advised of his right to remain silent, his right to counsel and that anything he says may be used against him in court, any

was Fayette's law office, no charge was pending against him, he was under no restraint and as a lawyer of some 19 years standing with some experience with criminal cases, his own testimony at the trial is enough to show that he sufficiently understood his right to remain silent and to consult a lawyer if he chose to do so. He explicitly testified that the statement was a voluntary one. He admitted that he was told that the investigation concerned the St. Johnsbury postmastership. His only complaint was that according to his version of the conversation and in contradiction to the testimony of FBI Agent Fowkes, he had not been informed that he himself was being investigated. But, so far as we are aware, such a warning forms no part of the constitutional pattern as outlined in the Supreme Court decisions on the subject.[5]

The teaching of Jackson v. Denno, supra, 378 U.S. 368, 84 S.Ct. 1774 (1964) is that the holding of an evidentiary hearing by the judge in the absence of the jury, and the making of findings on the matters of fact that govern the admissibility of the confession or statement is a sufficient compliance with the requirements of due process. Only such findings, made without any consideration of the question of the truth of the confession or incriminating statement and the guilt or innocence of the defendant of the crime he is alleged to have committed, can now be regarded as "a reliable determination on the voluntariness issue which satisfies the constitutional rights of the defendant." 378 U.S. at page 387, 84 S. Ct. at page 1786. There can be no doubt of the fact that the hearing held in this case in the absence of the jury was in conformity with these principles.

■ Nevertheless, and for the future guidance of the trial judges in this Circuit we think the judge's finding that the oral or written confession or incriminating statement was voluntary and otherwise not in violation of constitutional requirements should not be disclosed to the jury by the trial judge or by counsel. While the rulings of the Fourth Circuit and the District of Columbia Circuit are otherwise conflicting, both agree that the judge's finding should not be disclosed to the jury. United States v. Inman, 125 U.S.App.D.C. 257, 352 F.2d 954, 956 (4th Cir. 1965); Clifton v. United States, 371 F.2d 354, 360 (1966), cert. denied 386 U. S. 995, 87 S.Ct. 1312, 18 L.Ed.2d 341 (1967).

## IV.

Every once in a while some lawyer takes a sentence or a paragraph from the opinion written by an appellate court judge and requests a trial judge to use the quotation in his instructions to the jury. More often than not the quotation is chosen because of its overtones and the possibility that it may have more weight with the jury than the law should

---

statement he should make must be completely and totally voluntary, free from all inducement and coercion whatsoever, such as prolonged interrogation or incarceration, duress, fear, threat or compulsion.

The jury should carefully scrutinize all circumstances surrounding an admission and determine whether it was made freely and voluntarily. If the jury finds that the admission was made by the Respondent freely and voluntarily with an understanding of the nature of his admission and without fear or coercion, either physical or psychological, or without promise of reward, the jury should consider the admission together with all the other evidence in determining the guilt or innocence of the Respondent. However, if the jury finds that the admission was not made freely and voluntarily, the jury should disregard it in its entirety.

In this case, this Court has found that this statement of the Respondent, Mr. Fayette, was made voluntarily and with full knowledge of his rights. However, it is for you and not this Court if you, the jury, should find from the evidence any reasonable doubt that this statement was not made voluntarily or with full knowledge of his rights, you should completely disregard the finding of this Court, and completely ignore any implication you have derived from such statement.

5. See Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

sanction. The following request #3, submitted by defense counsel, is a prime example:

> Evidence of the defendant's good character is in the same category as other factual evidence, and must be considered by you in your deliberations, and may, of itself, create a reasonable doubt as to the guilt of the defendant.

■ This instruction should not be given, at least without the qualification that the so-called character evidence should be considered along with all the other evidence in the case in the determination by the jury of the question of guilt or innocence. United States v. Lowenthal, 224 F.2d 248 (2d Cir. 1955).

■ The following instruction on the subject was given by Chief Judge Gibson:

> Now, the Respondent has introduced evidence tending to show that he has a good reputation for honesty and integrity among the people in the community and in this state in which he has lived. What a person's general reputation is for honesty and dishonesty is evidence tending to show what his character is in that regard. What his character is for honesty is a question of fact for you to decide, and the evidence tending to show his general reputation. If you find that the Respondent's character for honesty is good, this is a fact that you should consider tending to show he would not be likely to commit the offense charged against him.
>
> If, after considering all the evidence in the case including the character evidence, you have a reasonable doubt of the Respondent's guilt, you should acquit him, but if you believe beyond a reasonable doubt—that is a doubt based on reason—that he committed the offense charged against him, you should convict him notwithstanding the evidence may satisfy you that he has always had a good reputation for honesty.

We find no error in the refusal to charge as requested. The instruction as given was a sufficient compliance with appellant's request. As we have repeatedly held, "if the trial judge has included in his charge-in-chief accurate instructions covering this or that phase of the case, it is not error to refuse to repeat substantially the same or a different statement of the same principles of law in the language submitted by counsel." United States v. Kelly, 349 F.2d 720, 760 (2d Cir. 1965), cert. denied 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), citing cases.

We cannot conclude without a word of praise both of the trial judge and of counsel for both sides for the able way in which this somewhat difficult trial was conducted. This speaks well for the administration of justice in Vermont. Moreover, it is interesting to note how easily arrangements were made, on the motion of the trial judge himself, to sequester the jury and avoid the impact of possible prejudicial publicity in newspapers, on television or by radio.

Affirmed.