**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Spiro ANOST and Joseph Cosentino,
Defendants-Appellants.**

**No. 15281.**

United States Court of Appeals
Seventh Circuit.

Jan. 26, 1966.

Frank Oliver, Chicago, Ill., for appellants.

Edward V. Hanrahan, U. S. Atty., John Peter Lulinski, John Powers Crowley, Charles H. Turner, Gerald M. Werksman, Asst. U. S. Attys., Chicago, Ill., Lawrence Jay Weiner, Asst. U. S. Atty., of counsel, for appellee.

Before HASTINGS, Chief Judge, and DUFFY and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

Spiro Anost and Joseph Cosentino, defendants, appeal from a judgment convicting them after trial by jury, for violation of Title 18, § 659, U.S.C. The indictment upon which they were tried charged unlawful possession of certain goods knowing them to have been stolen and which goods were a part of an interstate shipment of freight. They were sentenced to prison terms.

The sole error relied on is the court's alleged denial of the right of defendants to explain their possession of the stolen goods, thereby denying their constitutional right to interpose a valid and legal defense to the charge.

According to the government's proof, a shipment of spark plugs and miscellaneous parts was being transported from Flint, Michigan, to Spencer, Iowa, via a Chicago, Illinois, trucking terminal.

FBI agent Grundler testified that he followed a white truck during the daytime of May 7, 1964 to Laramie and 38th streets where it backed up to a red Ford truck in a parking lot area. He saw two persons transferring cartons from the red truck to the white truck. Grundler was joined by agent Lee and talked to the two men who were in the truck. They declined Grundler's offer of help. The agents then identified themselves.

Frank Faciano testified that the red truck had been stolen from him during the night of May 4, 1964, in Northlake, Illinois.

There was evidence that defendant Anost had known defendant Cosentino for four or five years as being engaged in a trucking business at 2045 Archer Avenue, Chicago, which was a combined filling station and truck terminal.

Outside the presence of the jury, counsel for defendants made two offers of proof, which expressly included (with the approval of the court) certain direct examination of both defendants and cross-examination by government counsel, all of which is incorporated in the record herein.

It thus appears by the offers that:

*(a) Cosentino would have testified as follows:*

On the morning of May 7, 1964, one Chang [1] called him at his home and informed him that Mr. Howard [2] had called Chang. Howard said he had a truck which broke down in Cicero and wanted somebody to exchange it and deliver it for him; that the freight that was in the truck that was broken down be put into another truck. After that conversation with Chang, Cosentino called Anost on the telephone at Anost's home. Between the first telephone conversation he had with Anost and the second, Cosentino had a telephone conversation with a man who identified himself as Mr. Howard. Howard said he had a truck broken down and that he needed a driver and a helper to switch the load and to deliver it. Cosentino told Howard that he had nothing in which to move the load and Howard said to meet him at 22nd and Laramie and that he would have a truck for him. After he finished talking with Howard, he then called Anost again. Cosentino met Mr. Howard on the corner of 22nd and Laramie. Howard was the second person whom he had asked if his name was Howard. After Howard identified himself, Howard asked Cosentino if he was the driver and he said he was. Howard again told him where the truck was and gave him the key for the red truck to be put either in the glove compartment or under the floor board. With respect to the white truck, Howard told Cosentino that the truck was across the street and that he was supposed to load the freight from the red truck into the white truck. Howard gave him $50 for doing the job, and told him

---

[1]. Chang was employed at a gas station at Archer and Wentworth Avenues, in Chicago.

[2]. Cosentino said that he had never met Howard prior thereto.

to deliver the merchandise after it was loaded to Harry's Auto Parts, Sedgwick and Ogden Avenue. Howard did not tell him that the merchandise in the truck was stolen; nor did he say anything from which Cosentino might be led to believe that the merchandise might be stolen.

*(b) Anost would have testified as follows:*

When Cosentino called him Anost said that he was getting ready to leave the house. Cosentino asked him if he would like to make some extra money and told him that he had received a call at home from the truck terminal on Archer Avenue, that somebody wanted his services for a trucking job. Anost asked what it consisted of and Cosentino said he didn't know at the time, that he was to wait at home to get another call. Anost said he was leaving his house to go to Empire Auto to get his car fixed. Cosentino said that he would call Anost at the garage. Anost then left his home, drove his car to Empire Auto and talked to Paul Pasquale, the owner of the garage to whom he turned over his car for repairs. While there Anost received a telephone call from Cosentino between 10:45 and 11:00 A.M. Cosentino said that the man called him at home for the trucking job and said that a truck broke down between 37th and 38th on Laramie and they had to transfer a load. Cosentino said he was supposed to pick up a truck to make the transfer. He asked Anost if he would pick up the truck and the latter said he would. Anost asked where the truck was supposed to be and Cosentino told him to go to the vicinity of Cermak and Laramie on a corner and meet a Mr. Howard. Anost asked what Howard would look like. Cosentino said that Howard would be out in front of the restaurant on the corner and just to ask for him. Cosenti· o said he did not know what Howard looked like. Cosentino told him to be there between 11:00 and 11:15. Anost said he could not possibly get there because his car was being worked on. Then Cosentino said that he would go down and get it himself. Anost then told Cosentino to meet him on Laramie Avenue between 37th and 38th Streets. Anost said that if Pasquale could possibly finish the car that he would get there, if not, he would try to get thereon a bus or with someone from the garage. Cosentino told him to be there as soon as possible and he said he would.

Anost then went from Empire Auto to between 37th and 38th Streets and saw one red truck and one white truck back to back. Cosentino was on the truck. Anost got up on the truck and asked if that was all they had to do and Cosentino replied that it was. Anost asked if Cosentino was paid for the job and Cosentino said he was paid $50. Anost told Cosentino he was sorry he was late and Cosentino replied he was a little late himself because he had had a little trouble finding the spot himself. They then started to move the freight from the red truck into the white truck. During the time they were moving freight he saw FBI agent Grundler dressed in a white T shirt and slack pants. Grundler said good morning, and asked if they needed any help. Cosentino said, "No, thank you, we can manage." Anost asked Cosentino who the man was and he replied he did not know but that he probably was the driver of the red truck.

The court overruled both offers of proof and sustained the government's objections to the receipt into evidence of the conversations mentioned therein.

On further direct examination of Cosentino before the jury, he testified that the man who identified himself as Mr. Howard gave him $50 and that when he attempted to locate Howard later at

Harry's Auto Parts, he was not able to do so; that at that place he was told that they had not heard of anybody by that name.

Anost testified that Cosentino telephoned him on the morning of May 7, 1964 and asked if he would like to make some extra money; that he did not know what the job consisted of but would get another call. Before 11:00 A.M. Cosentino telephoned Anost. Anost then was driven by garage man Pasquale to Laramie Avenue between 37th and 38th Streets and saw a red truck and a white truck back to back. He and Cosentino started to move the freight from the red truck to the white truck during which time a man (later identified as Agent Grundler) asked if they needed any help, which was declined by Cosentino. Anost asked Cosentino who the man was and was told it was probably the driver of the red truck. Grundler then placed them under arrest.

1. In this court defendants contend that the district court refused to permit them to explain their possession of the merchandise. They insist that they were thus deprived of showing that they had no knowledge of the stolen character thereof.

Although the court permitted Anost to testify that he had two telephone calls from Cosentino on the morning in question, he was not permitted to testify as to the contents thereof. Likewise, Cosentino was permitted to testify that he made calls to Anost but not as to what he said to him.

■ In conformity with the language of the statute and the indictment in this case, the government had the burden of proving that defendants knew that the property involved in this case was stolen. This principle was recognized in United States v. Carengella, 7 Cir., 198 F.2d 3, at 7 (1952) where Judge Duffy said:

"* * * mere possession of recently stolen property warrants the inference of guilty knowledge unless a satisfactory explanation of possession is made consistent with innocence, * * *."

In the case at bar defendants attempted to satisfactorily explain their possession of the stolen property, but the court's ruling prevented them from submitting their explanatory evidence in the presence and hearing of the trier of the facts.

In Levi v. United States, 5 Cir., 71 F.2d 353 (1934), at 354, the court said:

"* * * Possession of goods recently stolen justifies the inference that the possessor has guilty knowledge of the theft, in the absence of explanatory facts or circumstances consistent with his innocence. Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090. * * * Under these circumstances, *surely it was for the jury to say whether such explanation as he gave was true or false. * * *"* (Emphasis supplied.)

■ We refuse to hold that a defendant is precluded from making an explanation of the possession of stolen goods for consideration by the trier of the facts. This is not only simple justice but it is the rule established by the decided cases. Among them are some where the evidence offered by the defendant, as an explanation for possession of stolen goods, were statements to the defendant by a person who did not appear as a witness at the trial, just as there was a Mr. Howard in the case at bar, who it is claimed made the arrangements for the transfer of the contents of the red truck to the white truck.

■ While the law is that a defendant in a case such as this has a right to show that his possession of stolen property is consistent with his innocence and the resolution of that question in the trial court is for the jury, the defendant, if convicted, would still have a right to appeal and have the reviewing court pass upon the correctness of the result reached on the issue of defendant's knowledge that the goods were stolen. That was the situation in Cherry v. United States, 78

F.2d 334 (1935), where this court reversed a conviction in a case presenting essentially the same issue as to hearsay evidence which is now urged upon us. In *Cherry*, four highwaymen took a truck from its driver and drove it to Chicago. The merchandise in it, consisting of 655 cases of canned goods, on the next day, was, through a middleman, sold to defendant Cherry and placed in his store with his stock of goods. The only issue was as to defendant's knowledge that the goods were stolen. He was in the grocery business in Chicago, and testified in his own behalf that "a man" (not identified) called and informed him that he purchased goods at auction and sold the same to the retail trade and "that he could deliver 650 cases of canned goods, * * *." Defendant paid $642 for the merchandise and $8 for the cartage. He took no receipt and no invoice was delivered to him. At 336, Judge Evans said:

"* * * we are not unmindful of the rule which makes the jury rather than the court the sole judge of the credibility of the witnesses. * * *

"* * * The issue, however, is not one of weighing the testimony, nor of credibility. It is one where we are called upon to ascertain the *existence of any evidence which tends to show that appellant [defendant] knew the goods which he purchased were stolen.* [Italics supplied.]

"The only circumstantial evidence, which unexplained, pointed to such a conclusion consists of the facts that (a) the goods were purchased from a thief, (b) shortly after the theft, (c) without obtaining a receipt or other evidence of the transaction, and (d) payment for the goods in cash.

"The explanation offered by appellant is not disputed. It is not inherently unreasonable, and we are unable for that reason to reject it. * * *"

The judgment of conviction was reversed by this court.

*Cherry* has been recognized as a leading case. Broom v. United States, 5 Cir., 342 F.2d 419 (1965); Torres v. United States, 9 Cir., 270 F.2d 252, 258, note 3 (1959).

We consider as a fact not without significance that the government in its brief, in answer to defendants' brief which relies on *Cherry*, makes no reference whatsoever to that case. Instead it cites our decision in United States v. Di Fronzo, 345 F.2d 383 (1965), which relies on United States v. Konovsky, 202 F.2d 721, 728, which rejected certain statements of unidentified persons, which had been offered as res gestae.

2. The government attempts to support the rulings of the district court in the case at bar on the theory that defendants' proffered evidence was *hearsay*, which was, indeed, the ground asserted by the district court for its exclusion.

 We do not rely on the res gestae doctrine and we hold that the court erred in excluding this evidence as hearsay. This conclusion is supported by ample authority. Thus in Wigmore on Evidence, Vol. VI, 178, it is said:

"The prohibition of the Hearsay rule, then, *does not apply to all words and utterances merely as such.* If this fundamental principle is clearly realized, its application is a comparatively simple matter. The Hearsay rule excludes extrajudicial utterances only when offered for a special purpose, namely as *assertions to evidence the truth of the matter asserted.*"

This principle has been recognized by this court in In re Sawyer's Petition, 229 F.2d 805 (1956), where we affirmed a judgment of a district court presided over temporarily by Judge Duffy of this court. At 809, we considered whether the testimony of one Hemmy was hearsay and said, in part:

"* * * If Krause had told Hemmy of some objective occurrence he had observed, Hemmy's testimony of what Krause had said would be

hearsay if offered to prove the occurrence Krause had observed. But when offered to prove only what he heard Krause say, Hemmy's testimony is not hearsay.

"The court below should have admitted the testimony of Hemmy, and considered it in its determination of facts. * * *"

Thus, in the case at bar, the statements made to the defendants were not offered *as assertions to prove the truth of the matters asserted*, and they are not excluded by the hearsay rule. Because they were offered for the purpose of showing facts made known to and relied upon by Cosentino and Anost, they were relevant, and they should have been admitted in evidence by the district court.

Defendants testified in their own behalf in this case and were cross-examined by government counsel.

For these reasons the judgment from which this appeal was taken is reversed and this cause is remanded for a new trial.

Reversed and remanded.