**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Leo PARENT et al., Defendants-Appellants.**

**Nos. 72–1419, 72–1504, 72–1600.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 26, 1973.

Decided July 18, 1973.

Rehearing Denied Sept. 20, 1973.

Thomas D. Decker, Federal Defender Program, George C. Howard, Martin S. Gerber, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., William T. Huyck, Ann P. Sheldon, Asst., U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and KILEY and PELL, Circuit Judges.

PELL, Circuit Judge.

Leo Parent, Robert Quagliato, and Miklos Polesti appeal from their convictions of conspiracy and willful and knowing possession of goods stolen from an interstate shipment, in violation of 18 U.S.C. §§ 371 and 659. On this appeal they contend that the goods at the time they were stolen had not yet become an "interstate shipment" as that term is used in 18 U.S.C. § 659 and that the evidence was insufficient either to show possession and knowledge of the theft of the goods or to support the conviction of conspiracy.

The case involves the theft of 250 mini-bikes from a shipment loaded by the manufacturer, Efenel Corporation, on a trailer order from the carrier, Carolina Freight Lines. Having received an order for the new mini-bikes from a North Carolina customer, the shipping clerk at Efenel called Carolina Freight Lines and ordered a 45-foot trailer to be spotted at the Chicago and North Western Team Track approximately a block from Efenel's building. This procedure was required since bridge repairs prevented a semi-trailer from being brought to the building. Efenel's employees then loaded the trailer with the mini-bikes, placed a seal on the door, and called Carolina to pick up the trailer. Approximately two hours later, Efenel's shipping clerk went to see why the Carolina driver had not come to sign the bill of lading. He found the driver but the trailer had disappeared.

Appellants contend that since the goods had not left the possession or control of their owner at the time of the theft, and since no bailment had been constituted with the trucker, they had not become an "interstate shipment" for purposes of 18 U.S.C. § 659. Most cases affirming convictions under 18 U.S.C. § 659 have dealt with thefts of goods after they have left the control or possession of the owners, but for the reasons given hereinafter, we hold that the facts of this case support a conclusion that the jurisdictional element was satisfied.

Initially we must reject appellants' reliance on Lowery v. United States, 271 F. 946 (7th Cir. 1921). There the Chicago, Burlington & Quincy Railroad had purchased in Herrin, Illinois, a load of coal. It had shipped the coal in one of its cars by what was called a slip bill to Christopher, Illinois. The employees in Herrin were to make out the bill of lading, allowing Christopher to take as much coal as needed. At one time the bill of lading was made out with Sioux City, Iowa, as the destination, but before it was sent by mail to Christopher, the destination was changed to Christopher itself. The coal was stolen while the car was on a siding in Christopher. This court rejected the Government's contention that because the bill of lading at one time had an out-of-state destination, the shipment was an interstate one:

> "The fact that a destination outside the state of Illinois was at one time written into the bill, even if wholly unexplained, does not overcome the facts with reference to actual carriage of the coal." 271 F. at 947.

It is clear that the court in *Lowery* felt that the only time in which it could say that the coal was a "shipment" was when it was going from Herrin to Christopher; an interstate destination was contemplated only after the coal came to rest and no action was taken to implement that destination. Here, however, action was taken specifically to send the mini-bikes interstate. Moreover, *Lowery's* facts are unique since there the individuals involved in the transportation of the coal were never in-

formed of the Sioux City, Iowa, destination; that destination was changed to Christopher, Illinois, before the bill of lading was forwarded to Christopher.

Nor do we find persuasive appellants' analogy to those cases concerned with the time at which goods enter interstate commerce so as to relieve them from local taxation. In Coe v. Town of Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715 (1886), the Court held that goods intended for exportation to another state are still taxable in the state of origin until they are actually started in the course of transportation to the state of destination or delivered to a common carrier for that purpose, and that the mere carrying of the goods to a depot for the purpose of transporting them was not in itself the start of that transportation. The Court emphasized that though the logs in the case were intended for export to Maine, they might never be sent into interstate commerce because the owner could change his mind and sell them within New Hampshire.

Two comments seem warranted with respect to *Coe*. First, as the court emphasized in United States v. Fox, 126 F. 2d 237 (2d Cir. 1942), when considering the predecessor to 18 U.S.C. § 659, "the test of whether a state may tax the goods is not a safe one for deciding whether Congress has power to regulate them." Second, the scope of Congress' power to regulate under the commerce clause has undergone substantial judicial broadening since *Coe* was decided. *Compare* Champion v. Ames, 188 U.S. 321, 23 S.Ct. 321, 47 L.Ed. 492 (1903), and Hammer v. Dagenhart, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918), *with* Wickard v. Filburn, 317 U. S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), and Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Furthermore, the facts in the present case point more clearly to the interstate character of the shipment than those in *Coe* since Efenel's employees had loaded and sealed the Carolina trailer as the first step in interstate transportation became intrastate only by vir-

tue of an intervening local asportation. We do not find *Coe* controlling.

The question remains, however, of whether or not the mini-bikes were, in the words of the statute, "moving as or which are a part of or which constitute an interstate or foreign shipment of freight . . . ." The statute serves an important role in protecting interstate commerce; therefore, "we must . . . be mindful that Congress has here undertaken to protect and promote the flow of goods in interstate commerce, and that this undertaking is not to be hampered by technical legal conceptions." United States v. Berger, 338 F.2d 485, 487 (2d Cir. 1964), cert. denied, 380 U.S. 923, 85 S.Ct. 925, 13 L. Ed.2d 809 (1965), quoted approvingly in Dunson v. United States, 404 F.2d 447, 449 (9th Cir. 1968), cert. denied, 393 U. S. 1111, 89 S.Ct. 925, 21 L.Ed.2d 808 (1969), and United States v. Cousins, 427 F.2d 382, 384–385 (9th Cir. 1970). This, of course, does not mean that we can ignore the language of the statute in an effort to protect all that Congress might have protected, but it does indicate the necessity of a common-sense analysis of the statutory language in light of the important statutory purpose. Thus, in United States v. Cousins, *supra*, the court found that a freight car that had been spotted on the consignee's spur to await unloading had not yet lost its interstate character. "The determination of whether a shipment is in interstate commerce at a given time is essentially a practical one, depending upon the relationship between the consignee, consignor, and carrier, the indicia of interstate commerce at the time the theft occurs, and the preservation of the congressional intent." 427 F.2d at 385. No single factor—such as the passage of risk of loss to the carrier or consignee —is conclusive in the determination.

Although most of the cases cited have found interstate character as soon as the goods have left the shipper's possession, United States v. Berger, *supra*, United States v. Fox, 126 F.2d 237 (2d Cir. 1942), and Sharp v. United States, 280

F. 86 (5th Cir. 1922), cert. denied, 260 U.S. 730, 43 S.Ct. 92, 67 L.Ed. 485, this merely reflects the fact that most of the litigation has centered on whether the goods had to reach the interstate carrier before they entered interstate commerce. We do not conceive that these cases represent the sole acceptable interpretation of the statute. Rather, the facts of the present case make it analogous to United States v. Sherman, 171 F.2d 619 (2d Cir. 1948), cert. denied, 337 U.S. 931, 69 S.Ct. 1484, 93 L.Ed. 1738 (1949), and United States v. Gollin, 176 F.2d 889 (3d Cir. 1949), cert. denied, 338 U.S. 848, 70 S.Ct. 89, 94 L.Ed. 519.

In *Sherman*, the goods, already labelled with the names of consignees, had been given to a trucker who was under contract to take them to the docks. When he reached the dock he went aboard the steamship to get the bill of lading signed. It was at this point that the goods were stolen. The Second Circuit, speaking through Judge Learned Hand, held that the fact that the bill of lading had not yet been signed by the carrier was an irrelevant difference and that the previous decision of United States v. Fox, *supra*, controlled: "We then made it the test that the goods should leave the possession of the shipper, and come into the custody of someone who without more than inevitable pauses was to pass them along." 171 F.2d at 622. Thus, the mere giving of the goods to a private contractor who was to take them to the common carrier is enough to invoke federal protection. *Cf.* United States v. Padilla, 457 F.2d 1403 (9th Cir. 1972). The question then becomes whether the loading of the common carrier's truck at a point removed from the shipper's warehouse is sufficient to obtain such protection.

In this respect the *Gollin* case is most helpful. The facts in that case reflect the problems engendered when the shipper is also the interstate carrier. The P. Ballantine & Son brewery in Newark, New Jersey, apparently had its own truck fleet for distributing beer in the metropolitan New York area. The truck had been loaded with beer and the trailer sealed. The loader got a bill of lading and signed it to release the truck from the dock. He then drove the truck two blocks down the street to the company's garage where he parked it to await the driver. The driver was supposed to sign the bill of lading and then depart, but the truck was stolen before he left. The court held these facts sufficient to sustain a conviction for theft from interstate shipment. In reaching its decision the Third Circuit emphasized the use of the disjunctive "or" with the word "constitute" in the statutory definition, concluding that "[i]t follows that the stealing of property which 'constitute' an interstate shipment is as much an offense under the law as stealing goods actually in transit in interstate commerce." 176 F.2d at 893.

■ Under this reading of the statute it would seem to make no difference that the beer had been loaded on the truck; all that would be necessary would be for the goods to be segregated for interstate commerce on the platform or at a terminal.[1] Here, however, we are not required to reach such an interpretation of the statute in order to affirm the conviction before us, for as the court in *Gollin* noted,

"Assuming arguendo that the contention of the defendants that there must be an actual commencement of movement in interstate commerce is cor-

---

[1]. In a prior appeal, reversing the district court on other grounds, the Third Circuit had relied on narrower grounds for finding interstate commerce: ". . . the commerce begins when the transfer of the commodity to another state is actually commenced. The sealed shipment had in effect been turned over to the interstate driver . . . . . Here the loader in delivering the sealed truck and the bill of lading to the interstate driver had started the truck on its interstate journey. The brewery thereafter, though the shipper, was functioning as its own interstate carrier." United States v. Gollin, 166 F.2d 123, 124–125 (3d Cir. 1948), cert. denied, 333 U.S. 875.

rect, nonetheless we are of the opinion that there is ample testimony in the record . . . to support the conclusion that a transfer or movement in interstate commerce had actually been begun before the theft took place. The beer had in fact been moved from the loading platform and placed in the truck. The truck itself had been moved, after its contents had been sealed and the bill of lading had been made out, to a point on a public street about two blocks from the loading platform; that is to say, the truck and its contents had commenced the movement which had been designed ultimately to take them to North Tarrytown." 176 F.2d at 894.

As in *Gollin*, the fact that it was the loader of the truck who actually caused it to be located away from the warehouse seems to be immaterial. What is obvious is that movement had taken place under the rule set out in *Sherman*, and this is not undercut by the fact that it was not an independent contractor who actually caused the transportation. Here, Efenel had ordered the trailer, the mini-bikes had been loaded on the common carrier's trailer some distance from Efenel's warehouse, and the bill of lading had been completed. Under these circumstances the jury was justified in concluding, as it apparently did, that interstate movement had actually commenced.

 As a subsidiary point to their initial argument, appellants attack the second of the district court's instructions on what constituted an interstate shipment:

"A shipment becomes a part of the interstate commerce the moment the shipment is sealed and a bill of lading for the shipment has been made out and the shipment has been segregated for pick up by a driver of the truck line hauling the shipment to another state."

To the extent that the instruction might imply that the shipment could have entered interstate commerce even if no trailer had yet been ordered or the mini-bikes had not been loaded on the trailer—a question which we have found unnecessary to decide—the instruction was not harmful. The undisputed facts as testified to by Mr. Yashinari, the shipping clerk at Efenel, were that the trailer was in fact ordered from Carolina and that it had been loaded with the mini-bikes and sealed. This testimony was never impeached.

Appellants' second contention on appeal is that the evidence adduced against them was insufficient to prove either the necessary possession or the requisite knowledge of the stolen character of the goods. The evidence as to both elements of the crime was obtained from witnesses to the unloading of the Carolina trailer at a warehouse in Elk Grove Village, Illinois, space in which had been rented to store the bikes a day or so after their theft. This one episode was the sole evidence of the involvement of the defendants in the theft and possession of the mini-bikes. The testimony at trial included the identification of Quagliato by the warehouse's shop foreman as the man who asked him to unlock the space in which the mini-bikes were stored and who helped unload the truck. The only other positive identification was that made by Thomas Sterba, an employee at the warehouse who spent four hours helping unload the mini-bikes from the trailer using a warehouse fork lift truck. He identified Quagliato as the man who asked him if he would help unload the truck and how much it would cost. He also testified that Quagliato was one of the men who helped unload the truck. Sterba stated that Parent had been with Quagliato when he had arranged for his help, that Parent had helped unload the truck, and that it was Parent who had paid him for his help. Finally, Sterba identified Polesti as one of the three men who approached him to rent a lift truck and as being present when Quagliato hired him to help unload the truck. Polesti was at the site during the unloading process, but did not actually assist in the physical unloading of the

truck. Sterba also described a fourth man who did help unload the truck, but who was apparently never found or brought to trial. Further, it was stipulated that each of the defendants admitted knowing the other two defendants.

■ "Generally, it is held that possession is dependent upon the extent of the defendant's dominion and control over the stolen property." United States v. Nitti, 444 F.2d 1056, 1057 (7th Cir. 1971). That dominion must not be "a passing control, fleeting and shadowy in its nature," but rather actual control. United States v. Wainer, 170 F.2d 603, 606 (7th Cir. 1948). Actual possession may arise from proximity to the goods, but need not. Thus, in *Wainer*, the appellant, who was acting as an agent in the sale, had his conviction reversed since there was a lack of evidence that he ever actually "possessed" the stolen beer. And in *Nitti*, where the appellant was the passenger in a tractor pulling a stolen trailer, the court reversed, stating:

> "There is not a scintilla of proof that defendant in this case, during the time he was a passenger in the tractor or previously, touched or saw or had any knowledge of the stolen property carried in the trailer. The tractor was operated, managed and controlled solely by Harty, with defendant as a passenger." 444 F.2d at 1059.

Even a defendant's presence alone in an apartment where stolen goods were being stored has, under specific facts explaining the presence, been found to be insufficient proof of "dominion and control" over the goods, United States v. Kearse, 444 F.2d 62 (2d Cir. 1971).

■ As to Quagliato and Parent, we think it clear that there was sufficient evidence of dominion and control to support a finding of possession. It was Quagliato who hired Sterba to help unload the mini-bikes, who himself helped unload the bikes, who backed the truck up to the loading dock, and who insisted that Sterba be paid in a "straight cash deal with no paper work included." Parent was present when Quagliato negotiated for Sterba's help; he was himself one of those who helped unload the trailer. Significantly, he told Sterba, in response to a question concerning the contents of the cartons, that he did not know, but that the cartons were being stored temporarily until they could be picked up again and taken to the "factory." Finally, it was Parent who paid Sterba for his help in unloading the trailer. Both Quagliato and Parent exercised dominion and control over the cartons containing the mini-bikes during this episode.

■ Furthermore, we need not rely totally on the actual possession since the law is clear that "constructive possession" will suffice under the statute. Thus, the court in United States v. Casalinuovo, 350 F.2d 207, 209 (2d Cir. 1965), concluded:

> "The crime in question is 'possession' of goods known to have been stolen from interstate commerce, and it cannot be assumed that Congress was intending to impose criminal liability only upon those persons caught redhanded holding goods they have seen stolen from an interstate truck or train. Accordingly, the courts have held the statute to reach 'constructive' possession as well as actual possession, *i. e.*, such a nexus or relationship between the defendant and the goods that it is reasonable to treat the extent of the defendant's dominion and control as if it were actual possession."

See also United States v. Cousins, 427 F.2d 382, 384 (9th Cir. 1970). In three cases from this circuit, the court has upheld convictions for possession of goods stolen from an interstate shipment even though the defendants did less actual touching of the goods than Quagliato and Parent, United States v. Catalano, 450 F.2d 985 (7th Cir. 1971), cert. denied, 405 U.S. 928, 92 S.Ct. 980, 30 L. Ed.2d 802 (1972), United States v. Spatuzza, 331 F.2d 214 (7th Cir. 1964), cert. denied, 379 U.S. 829, 85 S.Ct. 58, 13 L.Ed.2d 38, and United States v. Williams, 194 F.2d 72 (7th Cir. 1952).

The evidence supporting the finding of possession by Polesti has less probative force than that pertaining to Quagliato and Parent, but in our opinion it is sufficient in the factual context. Polesti, although apparently not a laborer in this particular vineyard, was identified by Sterba as one of the three men who approached him side by side to ask him if "they could rent a lift truck." While Quagliato was the spokesman, the jury had ample reason for finding a joint venture in the unloading. Labor forces are not unknown to consist of supervisors as well as those who perform the chores. Polesti relies on United States v. Nitti, *supra*, to support his claim that Polesti's inactivity constituted insufficient evidence of control and dominion. But in *Nitti* the court specifically noted that "[t]here is not a scintilla of proof that defendant . . . touched or saw or had any knowledge of the stolen property . . . ." 444 F.2d at 1059. Polesti, on the other hand, was present during the unloading proceedings and clearly "saw" the stolen goods.

The facts of the present case are much closer to those in United States v. Catalano, *supra*. In that case, four of the defendants had been previously detained by the police on suspicion but were ultimately released. Later three of the defendants were observed by the police in the vicinity of a stolen trailer. They cut the lock, looked in at cartons marked "Zenith Television," and left "smiling." Shortly thereafter, Cullotta and Moscatello arrived and with the other three defendants entered the yard and went to the rear of the trailer. They had not actually opened the trailer when the police arrested them. In affirming the convictions, Judge Kiley wrote for this court: "We think the jury could reasonably infer from this evidence that at that time the five appellants had joint domination and control over the trailer and its contents, so as to justify a finding of possession." 450 F.2d at 991. See also United States v. Nalley, 455 F. 2d 259, 262 (6th Cir. 1972).

Similarly, in rejecting one defendant's claim of insufficient evidence, Chief Judge Swygert stated "[the defendant] had been in the garage where boxes were found containing goods that were part of the shipment in question. They participated in moving the van containing the other part of the stolen merchandise out of the garage." United States v. Spatuzza, *supra*, 331 F.2d at 216.

Although these cases are factually distinguishable from the present one, we are convinced that the appellant Polesti's challenge to the sufficiency of the evidence of possession was one that was properly for the jury. We cannot hold, as a matter of law, that his unexplained presence at the unloading of the stolen goods was insufficient to sustain the conviction. In *Wainer* and *Kearse*, both the courts emphasized that the appellants had rebutted the inference of possession drawn from the initial facts in the case by a compelling factual explanation. No such explanation was ever presented by any of the appellants herein. As Judge Stevens stated in United States v. Holmes, 452 F.2d 249, 255 (7th Cir. 1971), cert. denied, 405 U.S. 1016, 92 S.Ct. 1291, 31 L.Ed.2d 479 (1972), "The mere presence of a third party would strongly suggest that he was intended to perform a useful function in connection with the transaction."

We are not unmindful of the requirement that the Government must prove its case and that a defendant's exercise of the constitutional privilege of refraining from taking the witness stand is no part of that proof. Here the Government presented sufficient evidence to justify the jury in finding possession on the part of all three defendants. Explicatory negation of that apparent possession, if there was a legitimate explanation, need not be dependent upon the testimony of the defendants themselves. Bona fide business transactions customarily involve other persons. No such exculpatory witnesses appeared in the present case.

We turn next to the evidence relating to appellants' knowledge that the goods were stolen. Essentially, appellants con-

tend that the normal inference of knowledge arising from the possession of recently stolen goods should not be applied to their case because in the cases affirming the inference there were additional incriminating facts of record. The cases approving the use of this inference are plentiful, most recently, Barnes v. United States, 412 U.S. 837, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973). Some of the lower court opinions are set out in United States v. Zemke, 457 F.2d 110, 114–15 (7th Cir. 1972), cert. denied, 406 U.S. 947, 92 S.Ct. 2051, 32 L.Ed.2d 335.

█ Appellants rely on Cherry v. United States, 78 F.2d 334 (7th Cir. 1935), and United States v. Anost, 356 F.2d 413 (7th Cir. 1966). In *Cherry* the court's opinion seems to have relied on the fact that the defendant's explanation of his possession was unchallenged and completely consistent with innocence. Thus, the presumption was overcome in *Cherry*. As we have observed hereinbefore, in the present case the appellants have adduced no explanation for their possession of the goods which is consistent with their innocence.[2] In *Anost*, the court cited *Cherry* only for the general propositions that the presumption may be overcome and that the question of fact can be reviewed by the appellate court. Here, since the presumption was not overcome by clear and convincing evidence, the matter was properly before the jury.

█ Finally, appellants contend that there was insufficient evidence to support the conviction for conspiracy. "Agreement is the primary element of a conspiracy. The formalities of an agreement are not necessary and are usually lacking since the mark of a successful conspiracy is secrecy." United States v. Varelli, 407 F.2d 735, 741 (7th Cir. 1969). The overt acts alleged in the indictment were the rental of the lift truck and the unloading of cartons.

The evidence, viewed in the light most favorable to the Government, reflects a joint endeavor to rent the lift truck. Quagliato and Parent unloaded the cartons, but it is not necessary that Polesti also have taken part in the second overt act or even any overt act as long as one of the conspirators did. Nassif v. United States, 370 F.2d 147, 151 (8th Cir. 1966). Also, as noted above, there was sufficient evidence to support the finding that all three of the appellants possessed the mini-bikes knowing that they were stolen from interstate commerce. That act would certainly be in furtherance of the conspiracy. On these facts, we hold that the appellants' contention that the evidence was insufficient to support the conspiracy count is without merit.

For the reasons given hereinbefore, the judgment of conviction is affirmed.

Affirmed.

---

2. In United States v. Zemke, *supra*, 457 F.2d at 114–115, we held that the use of the inference did not unconstitution-ally burden the defendants' Fifth Amendment rights.