**UNITED STATES**

v.

**Robert HARDAWAY, Donald Moore, George Vantrece and Dennis Wills.**

**No. 77 CR 721.**

United States District Court, N. D. Illinois, E. D.

July 17, 1978.

Thomas P. Sullivan, U. S. Atty. by Robert W. Tarun and Thomas Anthony Durkin, Asst. U. S. Attys., Chicago, Ill., for plaintiff.

Mildred G. Peters, Northfield, Ill., Paul Bradley, Gregory A. Adamski, Val R. Klink, John H. Alexander, Chicago, Ill., for defendants.

## MEMORANDUM ORDER

BUA, District Judge.

The defendants, Robert Hardaway, Donald Moore, George Vantrece and Dennis Wills, were named in a two count indictment returned by the August, 1977 Grand Jury. In Count I, each defendant is accused of stealing certain goods and chattels on July 5, 1977 from the loading platform of the Spiegel, Inc. facility located at 1925 W. 39th Place, Chicago, Illinois. These goods and chattels, having a value in excess of $100.00, allegedly were part of and constituted an interstate shipment of freight. Only defendant Dennis Wills is named in Count II, where he is charged with the theft on the same date of certain other goods and chattels, valued at more than $100.00, from the aforementioned loading platform. It is contended that these goods and chattels were also part of and constituted an interstate shipment of freight. The thefts discussed in both counts were alleged to be in violation of 18 U.S.C. § 659.[1]

█ If the defendants are to be found guilty of the charges set forth in the indictment, violations of 18 U.S.C. § 659, it must be proven beyond a reasonable doubt that they knowingly stole the goods described in the indictment with the intent to convert them to their own use, that the goods described in each count had a value of more than $100.00, and that such goods were part of or constituted an interstate shipment of freight. Proceeding first to the question of value, it is readily apparent to this court that the goods described in each count had a value in excess of the requisite dollar amount.[2] Any reasonable examination of these goods, which include among them portable color televisions and air conditioners, would lead inescapably to that conclusion. In addition, the parties stipulated to the value of all but one of the goods, and the remaining item, a GE portable television set, was clearly worth more than $100.00. Accordingly, this court determines, as a matter of fact, that the goods in question each had a value in excess of $100.00.

It is also apparent, after a review of the evidence presented at trial through stipulations and the testimony of various witnesses, that the defendants knowingly stole the goods described in the indictment with the intention of converting them to their own use. Defendants Hardaway and Wills were dockhands employed by Spiegel. Although for this reason they could properly handle goods such as those described in the indictment while on the loading platform, it is clear that neither man had authority to sell Spiegel merchandise nor was either permitted to give such merchandise to transporters of his own choosing. Thus, when defendants Hardaway and Wills released the goods to their co-defendants and others not authorized to receive them, they did so with the knowledge that they were stealing the items.

Several other factors conclusively show that defendants Vantrece and Moore knew they were participating in a venture involving stolen goods. They received the items from a location where customer pick-ups were not permitted, and the merchandise was passed to them in a highly unorthodox manner—no one was required to pay for the goods nor was anyone required to acknowledge the receipt of them. Rather, the merchandise was merely thrown down to defendants Vantrece and Moore to be loaded into their cars. As to the parcels themselves, each carton was distinctly labeled and contained the name and address of the consignee (the customer who actually ordered the merchandise) as well as information regarding the appropriate carrier or transporter. This in itself should have raised serious doubts in the minds of the defendants as to the propriety of removing the goods. Lastly, defendant Moore admits in his post-arrest statement that he and his fellow participants were aware beforehand

---

1. 18 U.S.C. § 659 is set forth in pertinent part in Appendix 1 of this Order.

2. A list of the goods described in each Count is included in Appendix 2 of this Order.

that the merchandise they were to pick up at Spiegel's was stolen. After consideration of these factors, it is the finding of this court that there could be no mistaken belief on the part of any of the defendants as to the nature of the goods in question.

It is also clear that the defendants intended to profit from the thefts charged in the indictment. In his post-arrest statement, defendant Moore states that the individuals who were to pick up the stolen goods from the Spiegel dock would each be paid a television set for their efforts. As to defendant Wills, he arranged with Special Agent Futrell of the Federal Bureau of Investigation (FBI) to place the goods described in Count II of the indictment on a trailer driven by Futrell in exchange for a payment of $100.00, although he was aware that Special Agent Futrell was not authorized to receive those goods. Also, in his post-arrest statement, defendant Wills indicates that defendant Hardaway was engaged in a continuous and on-going series of thefts from the Spiegel loading platform. He admits receiving cash and merchandise from defendant Hardaway throughout 1977 (prior to his arrest) for assisting Hardaway in a number of those thefts. These admissions, coupled with the fact that the goods described in Count I were being unloaded in an alley behind a former residence of defendant Hardaway, are sufficient to allow this court to determine that Hardaway also intended to convert the stolen goods to his own use.

The evidence additionally establishes beyond doubt that the named defendants were the actual parties to the thefts that took place on July 5, 1977—the thefts depicted in each Count of the indictment. As to Count I, Special Agent Futrell testified that on the date in question he observed defendants Hardaway and Wills throw Spiegel merchandise from the loading platform to three individuals located below. This testimony is to a great extent corroborated by that of Charles Sheldon, a coworker of these defendants testifying for the government. He also observed defend-

ant Hardaway passing merchandise to others located below the loading platform. In addition, his testimony places defendant Wills on the loading platform near the time the theft was to have occurred.

Two of the individuals observed receiving the merchandise from the loading platform were identified by Special Agent Futrell as defendants Vantrece and Moore. They were seen placing the goods into two cars they had moved into the loading platform area, a Ford bearing Illinois License YW4031 and a Chrysler bearing Minnesota License AG7617. FBI surveillance agents then observed defendants Vantrece and Moore drive the cars to an alley behind 6829 S. Racine in Chicago, the former residence of defendant Hardaway, where they were parked and opened. As defendant Moore and the unidentified third individual began to unload merchandise from the Chrysler bearing the Minnesota License, the FBI surveillance agents appeared on the scene. Defendant Vantrece was placed under arrest as he stood beside the Ford bearing the aforementioned Illinois License, and defendant Moore was apprehended shortly thereafter, following a brief chase. The third individual escaped. The goods described in Count I were recovered from the aforementioned Ford and Chrysler and from a gangway behind the S. Racine address. Finally, after having been taken into custody, defendants Vantrece and Moore both admitted their participation in the theft in their post-arrest statements.

With regard to Count II, the evidence is equally persuasive. In June of 1977, Special Agent Futrell was introduced to defendant Wills by one Eddie Walker, a Presson's Delivery Service driver who had aided defendants Hardaway and Wills in the removal and sale of stolen Spiegel goods at various times in the past. Special Agent Futrell was introduced as Walker's new driver-partner. On June 28, as he freely admits in his post-arrest statement, defendant Wills gave Agent Futrell his home telephone number and asked Futrell to call him

there whenever he wanted Spiegel merchandise. On the morning of July 5, 1977, Agent Futrell called Wills at that number and arranged to purchase certain unspecified goods from Wills later that day. That afternoon, defendant Wills sold two items of Spiegel merchandise to Special Agent Futrell for $100.00, then placed those goods on the Presson's trailer being used by the agent. The items purchased by Futrell were those goods described in Count II of the indictment.

The question of whether the aforementioned goods were part of or constituted an interstate shipment of freight, though, is not so readily answered. That these items were shipments of freight is abundantly clear. Whether the goods had taken on the characteristics of an interstate shipment at the time each was stolen, however, is not as apparent. Some discussion of this issue is therefore warranted. Before any analysis of this element of 18 U.S.C. § 659 can begin in the factual context of the instant case, though, certain principles regarding the statute itself must be mentioned.

■ The statute serves an important role in protecting interstate commerce. Through it, Congress has undertaken to protect *and promote* the flow of goods in interstate commerce, and the carrying out of this purpose "is not to be hampered by technical legal conceptions." *United States v. Parent*, 484 F.2d 726, 729 (7th Cir. 1973). *See United States v. Astolas*, 487 F.2d 275, 279 (2d Cir. 1973); *United States v. Cousins*, 427 F.2d 382, 384–85 (9th Cir. 1970); *United States v. Berger*, 338 F.2d 485, 487 (2d Cir. 1964). This does not mean that the language of the statute can be ignored in an effort to protect all that Congress might have protected, but the rule does call for a common sense analysis of the statutory language with respect to this important statutory purpose. *United States v. Parent*, 484 F.2d at 729. The determination of whether a shipment is in interstate commerce, therefore, must be a practical one administered on an ad hoc basis. *United States v. Astolas*, 487 F.2d at 279. *See United States v. Parent*, 484 F.2d at 729; *United States v. Cousins*, 427 F.2d at 385.

■ Finally, with respect to the statutory language most pertinent to the present case, "moving as or which are part of or which constitute an . . . interstate shipment," it is important to note that it is not necessary for the goods in question to be actually moving in interstate commerce at the time of the theft for an offense to lie under 18 U.S.C. § 659. *United States v. Williams*, 559 F.2d 1243, 1247 (4th Cir. 1977). It can be plainly inferred from the statute that a theft from interstate commerce could be committed before the items are placed on board a carrier.[3] *United*

---

3. The statute suggests three ways in which the commerce requirement can be met: the goods can be (1) moving as an interstate shipment, (2) part of an interstate shipment, or (3) constituting an interstate shipment. The use of the conjunction "or" between the clauses suggests that the criteria are disjunctive rather than conjunctive. *See United States v. Gollin*, 176 F.2d 889, 893 (3d Cir.), *cert. denied*, 338 U.S. 848, 70 S.Ct. 89, 94 L.Ed. 519 (1949).

In his closing argument, defendant Wills contends that § 659 is primarily a venue provision, designed to give the federal government jurisdiction only in certain situations. He bases this belief on his interpretation of the legislative history of the predecessor statute to § 659. This same argument, however, was confronted and rejected by the Second Circuit in *Astolas*, where the court noted:

The phrase . . . 'moving as or which are a part of or which constitute an interstate or foreign shipment,' was the phrase chosen by Congress in 1913 when it first enacted the predecessor of Section 659. The legislative history of the 1913 bill sheds no light on the meaning of the phrase. The bill was reported to the Senate by the Judiciary Committee with the recommendation that it be passed, but without other comment. S.Rep. 1132, 62d Cong., 3d Sess. The floor debates reflect only an attempt to amend the bill to transmute it into a venue provision, defining a federal crime only if venue did not lie in any state because of the interstate character of the theft. The proposed amendment was rejected out of hand. 487 F.2d at 279.

*States v. Astolas*, 487 F.2d at 279. All that is required is that the goods be part of or by themselves constitute an interstate shipment. *United States v. Williams*, 559 F.2d at 1247.

When the factual situation presented by the instant case is reviewed in light of the aforementioned principles, the appropriateness of § 659 becomes clear. The victim of the defendants' wrongdoing, Spiegel, Inc., is a national mail order company serving customers in all fifty states. Customer orders it receives are processed electronically through the company's computerized order control system. In Chicago, orders are received in the Spiegel facility located at 1040 W. 35th Street, where Cathode Ray Tube (CRT) operators enter them into the corporate computer. After it is informed of the particular items selected, the customer, the appropriate prices and the destination of the order, the computer schedules when and how the order is to be filled and shipped. It next prints out a sales slip and shipping label, both of which contain the name and address of the consignee, the date of the shipment and certain other related information. Transportation charges, however, are not calculated at this stage in the system.

The sales slips and shipping labels are then delivered by messenger to the warehouse facilities storing the particular items ordered. Hardline items, such as those described in the indictment, are stored in the Spiegel warehouse located at 1925 W. 39th Place, the site of the alleged thefts. The procedure followed in that location is for order pickers to examine the sales slips and labels, pick the items from storage, then bring them to a checker station. The checker station on each storage floor is equipped with a computer terminal that is connected to the central computer. After he has made certain that the item has been properly picked, the checker detaches the shipping label from the sales slip and inserts it into the computer terminal. The ordered item is then weighed on an electronic scale connected to the terminal. A transportation charge is now calculated by the computer and printed onto the shipping label. At this time, the computer also bills the Spiegel customer for the transportation charge, credits the account of the designated carrier or transporter of the ordered item and selects the information needed to create shipping manifests and other post-shipment related material. In essence, it is at this point in the system where the computer, and therefore Spiegel, Inc., concludes that the ordered item is in transit to the customer.

After the transportation charge has been printed, the shipping label and sales slip are affixed to the merchandise. The labeled parcels are then placed on a conveyor belt for transportation to the first floor slide area, where sorters segregate them by carrier and transporter based on certain information found on the shipping label. At the W. 39th Place facility, more than ten thousand parcels a day are handled in this first floor area. Once they have been segregated, the parcels are put on flat trucks, which are taken out to the loading platform by dockhands such as defendants Hardaway and Wills. They are then loaded onto trailers for transportation to the customer. On the average, once a parcel has been placed on the conveyor it takes less than four hours for it to reach and pass through the first floor loading area and be loaded into the appropriate truck.

After viewing the Spiegel system for processing customer orders in its entirety, the question of whether the goods at issue were part of or constituted interstate shipments at the time of the theft is more easily answered. For the purposes of 18 U.S.C. § 659, the resolution of this question will depend on the relationship between the consignee, the consignor and the carrier, indicia of interstate commerce at the time the theft occurred, and the need to preserve the intent of the Congress. *United States v. Parent*, 484 F.2d at 729; *United States v. Cousins*, 427 F.2d at 385. Remembering that this determination is to be a practical one based on common sense and must, out

of necessity, be administered on an ad hoc basis, *United States v. Astolas*, 487 F.2d at 279, it is the belief of this court, after a close examination of the relevant facts, that the goods in question were in fact in interstate commerce at the time they were stolen by the defendants.

■ Spiegel, Inc., as was noted earlier, is a national mail order company that daily sends thousands of items to customers in every state. It is a major merchandiser whose annual sales of $360,000,000 vastly effect and further interstate commerce. If it was the intent of Congress to promote the flow of goods into interstate commerce with the enactment of § 659, then it cannot be denied that Spiegel, Inc. is the type of company whose business the Congress desired to protect by the statute. The goods in question were on a flat truck on the Spiegel loading platform at the time they were stolen. If defendants Hardaway and Wills first placed the goods into one of the tractor-trailers located only a few feet away, then removed them and carried them off, § 659 would clearly be applicable. To conclude that the statute is not equally applicable to the facts as they actually occurred could only frustrate the clear intentions of Congress. Such a finding would impede, not promote, the flow of goods into interstate commerce.

That the goods bore the indicia of interstate commerce at the time the theft occurred is also readily apparent. Each item described in the indictment had affixed to it a shipping label containing the name and address of the customer as well as information designating the appropriate carrier or transporter. Every parcel listed was destined to go to an out-of-state customer via an interstate carrier. Also, the goods were stolen from a facility where interstate shipments are regularly handled. Of the ten thousand parcels a day that are shipped from the W. 39th Place loading platform, the vast majority are sent to locations outside of Illinois. Finally, the shipping documents provide strong evidence that Spiegel

definitely intended for these customer orders to become interstate shipments. *See United States v. Astolas*, 487 F.2d at 279–80. As was indicated previously, the shipping labels as well as the sales slips affixed to the parcels in question dictated that the items be delivered to out-of-state destinations. In addition, the majority of these items were to be transported by way of United Parcel Service (UPS). Computer manifests are used instead of bills of lading for UPS shipments, and such manifests do not accompany the goods to be shipped. Rather, they are generally prepared at a later date. The manifest relating to the goods in question was prepared by the Spiegel computer during the night following the theft, based on information provided the computer when each parcel was weighed at the checker station. Thus, at the time they were weighed, Spiegel contemplated with certainty that the goods in question would enter into and become part of interstate commerce.

It is true that, at the time the theft occurred, the goods had not as yet been put into the hands of a carrier. This fact cannot, however, be controlling for under the statute no single factor, such as passage of the risk of loss to the carrier or consignee, is conclusive when determining whether a shipment is in interstate commerce. *United States v. Parent*, 484 F.2d at 729. The soundness of this principle is illustrated by the factual situation presented in the instant case. Here, in an effort to develop an order processing system that would result in a reduction of the handling and delivery time for customer orders, yet would lessen the overall costs to the consumer, a large volume national merchandiser has availed itself to the fruits of modern computer technology. The fully computerized order control system now in use by Spiegel, Inc. did lead to faster, lower cost deliveries, and accordingly, the flow of goods into interstate commerce was significantly enhanced. The major drawback to the Spiegel system is that the company loses effective control of the ordered merchandise at the time the

goods are released by the various checker stations. It is at this point, where the computer concludes the goods have actually been shipped, that Spiegel loses, in all practicality, its ability to cancel or intercept an outbound customer order.[4] The remaining steps, the routine sorting and loading of the items on the first floor, generally take less than four hours to complete, and the volume of goods handled in this area is enormous. When these factors are evaluated realistically, it becomes apparent that Spiegel merchandise is irretrievably placed into the stream of interstate commerce at the time the customer order is ˙processed through the checker station. In light of this fact, it would not be proper for this court to hold that, for the purposes of § 659, the goods in question did not constitute interstate shipments solely because they had not been put in the hands of a carrier. Such a finding, founded entirely on a technical ˙legal concept, would obviously frustrate the intent of Congress to promote the flow of goods into interstate commerce. It would, therefore, clearly be impermissible. *United States v. Astolas,* 487 F.2d at 279; . *United States v. Parent,* 484 F.2d at 729; *United States v. Cousins,* 427 F.2d at 384–85; *United States v. Berger,* 338 F.2d at 487.

In their closing arguments, the defendants note that the majority of decisions interpreting 18 U.S.C. § 659 have held that the goods in question acquired their interstate character at the time they left the shipper's possession. While this is true, it merely reflects the fact that most of the litigation has centered on whether such goods were required to reach the interstate carrier before being found to have entered interstate commerce. The Seventh Circuit, in reviewing a similar argument, concluded that these cases do not represent the sole acceptable interpretation of the statute. *United States v. Parent,* 484 F.2d at 730. Furthermore, this court is not alone in its construction of § 659 as applied to the goods in question. The case of *United States v. Williams,* 545 F.2d 1036 (6th Cir. 1976) dealt with the theft of fifteen cans of herbicide from the loading dock of the producer-shipper. As is true in the case now before the court, the goods were stolen from the loading platform at a time prior to their being put in the hands of a carrier. Relying on this point, the defendant, on appeal, challenged the finding that the goods were in interstate commerce when the theft occurred. In affirming the decision of the lower court, the Sixth Circuit concluded:

. . . there is no merit to appellant's· argument that the stolen cans of herbicide lacked interstate character at the time of the theft. The relationship between the business parties involved in the production and distribution of the herbicide, the nearly continuous consignment and movement of the finished cans, and the theft itself from the loading and shipping facilities of the producer are 'indicia

---

4. At this point, the consignee has been billed for the ordered merchandise, including transportation charges, the Spiegel computer account of the carrier or transporter has been credited with the appropriate fee for transporting the item, and the computer has compiled the information it needs to complete shipping manifests and other post-shipment documents later that evening. In essence, the computer has determined that the order has been shipped. Thus, if Spiegel were to discover an error regarding a particular order after this processing step had been completed, it would be of the belief that the merchandise was already on the way to the customer and would proceed accordingly. This belief would generally be factually correct as well, because customer orders are ordinarily put into the carriers' hands within four hours of their release from the checker station.

The practical problems with retrievability after this step has been completed must also be viewed realistically. More than 1200 parcels pass through the first floor loading area every hour. To locate a particular item after it had properly reached this area would, as was stated by Spiegel employee Edward Bigus at trial, "be like looking for a needle in a haystack." When it is remembered that Spiegel would have at most four hours to intercept such an item before it was shipped, retrievability must be viewed as being virtually impossible in any practical sense.

of interstate commerce' amply demonstrated by the Government at trial (citations omitted). 545 F.2d at 1039.

In conclusion, many conceptual similarities exist between the instant case and the decision reached by the Second Circuit in *Astolas*. As this court perceives itself to be in a position not unlike the one then facing the Second Circuit, it accordingly cites with approval the following language from that decision:

If it be true that the situation before us in this case is a novel one and that the state of the authorities is such as to leave a loophole through which thieves may safely emerge unscathed and unaffected by any federal criminal statute to the frustration of the obvious purpose of the Congress in the enactment of Section 659 to facilitate rather than to impede the movement of goods in interstate commerce, it is high time that the loophole be closed. 487 F.2d at 282.

It has been found, as matters of fact, that those goods described in each count of the indictment individually had a value in excess of $100.00, that the defendants knowingly stole the goods in question with the intent to convert them to their own use, and that such goods were part of or constituted interstate shipments of freight at the time the thefts occurred. Accordingly, it is the conclusion of this court that defendants Hardaway, Wills, Vantrece and Moore are guilty beyond any reasonable doubt of the charges presented in Count I of the indictment, violations of 18 U.S.C. § 659. It is also held that defendant Wills is guilty beyond any reasonable doubt of the charges presented in Count II, also violations of 18 U.S.C. § 659.

## APPENDIX 1

18 U.S.C. § 659 states in pertinent part:

Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property; or

Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen;

\* \* \* \* \* \* \* \* \* \* \* \* \*

Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The offense shall be deemed to have been committed not only in the district where the violation first occurred, but also in any district in which the defendant may have taken or been in possession of the said money, baggage, goods, or chattels.

\* \* \* \* \* \* \* \* \* \* \* \* \*

A judgment of conviction or acquittal on the merits under the laws of any State shall be a bar to any prosecution under this section for the same act or acts. Nothing contained in this section shall be construed as indicating an intent on the part of Congress to occupy the field in which provisions of this section operate to the exclusion of State laws on the same subject matter, nor shall any provision of this section be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this section or any provision thereof.

## APPENDIX 2

The following is a listing of those goods described in Counts I and II of the indictment, including the value of each good as stipulated to by all of the relevant parties.

### Count I

1. General Electric (GE) 10″ color portable model WHE5215WD
   Stipulated value—$198.00

2. General Electric (GE) 10″ color portable model WHE5215WD
   Stipulated value—$198.00

3. GE 15″ black and white portable TV, model XB 3161BK
   Stipulated value—$119.95

4. GE 10″ color portable TV, model WHE5215WD
   Stipulated value—$198.00

5. GE 10″ color portable TV, model WHE5215WD
   Stipulated value—$198.00

6. GE 10″ color portable TV, model WHE5215WD
   Stipulated value—$198.00

7. GE carry-cool portable air-conditioner, model AGTE–604–FBX–78–8125
   Stipulated value—$239.54

8. Juliette stereo/radio 8-track unit, model C650
   Stipulated value—$189.95

9. GE carry-cool portable air-conditioner model 78–8125
   Stipulated value—$239.54

10. Panasonic portable black and white TV, model TR 515
    Stipulated value—$144.95

11. Panasonic portable black and white TV, model TR 515
    Stipulated value—$144.95

12. Panasonic portable black and white TV, model TR 535
    Stipulated value—$199.95

13. Panasonic portable black and white TV, model TR 515
    Stipulated value—$144.95

14. BSR–2000AX McDonald Record Changer
    Stipulated value—$139.77

### Count II

1. GE portable color TV
   Stipulated value—no value stipulated

2. Emerson Quiet-Kool air-conditioner
   Stipulated value—$139.90